No.  88-623

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

THE BILLINGS CLINIC, a partnership,
      Plaintiff and Respondent,
-vs-
PEAT MARWICK MAIN & CO., a partnership,
and DONALD A. BLACKWELL,
      Defendants and Appellants.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                In and for the County of Yellowstone,
                The Honorable Robert Holmstrom, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

              John D. Stephenson, Jr. argued, Jardine, Stephenson,
              Blewett & Weaver, Great Falls, Montana; Leonard P.
              Novello,  General   Counsel,  James  F.  Kennedy,
              Associate General Counsel, Peat Marwick & Co., New
              York,  New  York;  Katheryn  A.  Oberly,  Scott  P.
              Perlman, Mayer, Brown &  Platt, Washington, D.C.

        For Respondent:

              Stuart  Pack  argued,  Sherman  &  Howard,  Denver,
              Colorado; Gerald J. Neely, Billings, Montana

        For Amicus Curiae:
              Louis A. Craco, Deborah E. Cooper and Diana B.
              Simon, Wilkie, Farr & Gallagher, One Citicorp
              Center, New York, New York (American Institute of
              CPA's); Ward A. Shanahan, Gough, Shanahan, Johnson
              & Waterman, Helena, Montana (Mt. Society of CPA's)

**FILED**

AUG 16 1990

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted:   June 6, 1990

Decided:

Filed:

_____
                   Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

The Billings Clinic, a partnership of medical doctors in Billings, proposed in 1982 to liquidate a corporation under § 331 of the Federal Internal Revenue Code, and contemporaneously to build a larger office facility financed by the issuance of industrial revenue bonds complying with federal tax laws. The Clinic retained Peat Marwick Main and Company, a national firm of accountants with offices in Billings, for "tax and accounting considerations" relating to the Clinic's plans. The critical issue here, among other important issues, is the outer extent of the professional duty owed to the Clinic by the accountants under the circumstances of this case. A jury in the Thirteenth Judicial District, Yellowstone County, found that Peat Marwick had breached its duty, and awarded damages in favor of the Clinic. Judgment was entered thereon and this appeal resulted. On consideration, we affirm.

**FACTS**

The principal business in 1982 and prior years of the partnership of medical doctors known as the Billings Clinic was the practice of medicine in Billings, Montana. It controlled two other entities, however. The Yellowstone Company was a Montana corporation, of which the shareholders were all of the medical doctors of the Clinic, and this corporation owned the Clinic building in Billings in which the doctors practiced medicine. The Yellowstone Realty was a Montana partnership comprised of the same

2

medical doctors as the Clinic, and the chief asset of The Yellowstone Realty was also realty other than the Clinic building.

In 1981-1982, the partners of the Billings Clinic had two related problems. One was the high capital cost for admission of new partners into the medical practice. To become a partner of the Billings Clinic, an incoming doctor was required also to become a partner in The Yellowstone Realty, and a shareholder in The Yellowstone Company. The value of the properties owned by The Yellowstone Realty and The Yellowstone Company had increased, so that the amount which doctors newly admitted to the Billings Clinic had to pay to "buy in" their share of the related entities had become expensive. This was described as the "buy-in/buy-out problem."

A second problem confronting the Clinic was an immediate need for additional space in which to conduct its medical practice. The Clinic decided in 1981 to renovate its downtown building and build a larger addition to its medical facility. The Clinic intended to finance this construction project with industrial revenue bonds.

The two problems were related because the Clinic's planned expansion meant that newly-admitted physicians would be required to buy "more building" at a higher cost.

To meet these problems, the Executive Committee of the Clinic formed two committees. The Alternative Buy-in Committee (ABC Committee) was formed in 1981 to study the buy-in/buy-out problem. It was chaired by Dr. Thomas P. Gormley and this Committee hired

the Los Angeles law firm of Pepper, Hamilton and Scheetz in 1982 to help solve the buy-in problem. In June 1982, the Pepper-Hamilton firm sent the Clinic a draft report containing recommendations. This report recommended that the Clinic reorganize and simplify its operations by making The Yellowstone Realty (the partnership) the sole property entity, and by eliminating The Yellowstone Company (the corporation) entirely. The report presented two ways to accomplish the reorganization: (1) the doctors could contribute their stock in The Yellowstone Company to The Yellowstone Realty partnership and then liquidate The Yellowstone Company pursuant to § 333 of the Internal Revenue Code; or (2) the doctors could sell their shares of stock in the Yellowstone Company to The Yellowstone Realty at fair market value and then liquidate The Yellowstone Company pursuant to § 331 of the Internal Revenue Code.

In a parallel action, the Executive Committee of the Clinic had established in 1981 a Building Committee, chaired by Dr. Stephen Kramer. This Committee was responsible for the construction and financing of a new addition to the Clinic building. In January, 1982, this Committee hired the Seattle law firm of Kieburtz and Simmonds as consultant for industrial revenue bond financing. Earlier in March or April of 1981, the Clinic had consulted Gareld Krieg of the Billings law firm of Crowley, Haughey, Hanson, Toole, and Dietrich, seeking a legal opinion as to the amount of capital expenditures the Clinic had available for the new addition without exceeding the $10 million capital

4

expenditure ceiling in § 103 of the Internal Revenue Code. In June of 1982, Kreig was retained to prepare and file, on behalf of the Clinic, an IRB application.

We must now inform the reader that the $10 million capital expenditure limitation in § 103 is the central factor upon which this case is based. As the law then stood, purchasers of properly-issued industrial revenue bonds obtained a favorable income tax status for federal tax purposes on interest received from the bonds. There was no limit as to the total amount of bonds to be issued, but there was a limit to the total capital expenditures made by the project owners within the same municipality within a six-year period, three years before and three years following the date of the issuance of the bonds. Based on figures supplied by the Clinic, Gareld Krieg had written to the Clinic on April 13, 1981, that after deducting such capital expenditures the Clinic had available to it $8.5 million in additional IRB financing authorized under the law.

In early June 1982, Dr. Gormley personally delivered the Pepper-Hamilton report to Ronald Haugan of the defendant Peat Marwick at its office in Billings. What instructions were given by Dr. Gormley to Haugan and Peat Marwick's view of what it was required to review for Dr. Gormley are a point of high dispute and will be discussed more fully under the issues hereafter. Mr. Haugan referred the review of the Pepper-Hamilton report to Donald A. Blackwell, one of the partners of Peat Marwick, for his attention. His review resulted in three letters to Dr. Gormley,

5

one dated June 25, 1982, another dated July 20, 1982, and the third, hand delivered, dated August 10, 1982. None of the letters mentioned any adverse impact that the recommended reorganization and liquidation of the corporation would have on the Clinic's industrial revenue bond financing.

Peat Marwick recommended to the Clinic that the doctors proceed with the reorganization by selling their shares of The Yellowstone Company stock to The Yellowstone Realty partnership at fair market value and then liquidating the corporation pursuant to § 331 of the Internal Revenue Code. The doctors voted at their August 10 meeting to adopt the recommendation and proceed with the § 331 reorganization. The reorganization was implemented through the Crowley firm on September 1, 1982, and became final on September 30, 1982.

In the meantime, the Clinic's Building Committee had not been idle. In September 1982, it let a construction contract for enlargement of the Clinic's office building. The Yellowstone Realty Partnership on September 23, 1982, accepted an offer of Security Mortgage Company to purchase $7.5 million of industrial revenue bonds for an interest rate of 75% of the prime rate subject to certain conditions, one of which was that laws relating to the bonds would be complied with. In turn, Security Mortgage hired the Minneapolis firm of Dorsey and Whitney as bond counsel to determine the legality of the bonds. William Johnstone, a partner in that firm, began work on the bond transaction.

The bond closing was to take place in Billings on December 16,

1982. Prior to that date, Johnstone was unaware that a restructure of the Clinic entities had taken place. While reviewing the Clinic's certificate of actual and projected capital expenditures, Johnstone noticed that no capital expenditures were projected for The Yellowstone Company after 1982. He asked Peggy O'Leary, the Clinic's comptroller, why the capital expenditures for The Yellowstone Company ceased in 1982. She explained that the Yellowstone Company had gone out of existence in 1982 as a result of the reorganization. Johnstone then raised the issue whether the reorganization constituted a capital expenditure. Amid general consternation among all concerned, it was finally determined that the reorganization itself constituted a capital expenditure in the contemplation of § 103 of the Internal Revenue Code. In fact, it constituted a capital expenditure of approximately $4.5 million. When this capital expenditure was combined with the Clinic's $1.5 million of past and future capital expenditures and the $7.5 million bond issue, the Clinic was substantially over the $10 million capital expenditure limit. Therefore, neither Johnstone nor any other bond counsel would give the necessary opinion that interest on the bonds would be income-tax exempt. As a result, the industrial revenue bond issue failed, in that such bonds were never issued.

Because the construction of the building addition had already been started and the Clinic did not want to reduce the size of the project, the Clinic determined that it would seek a conventional loan. The Clinic obtained a loan from Security Mortgage, with a

floating rate of prime plus 1 percent. New construction was completed and the building occupied in October, 1983. In 1984, fearing rising interest rates, the Clinic replaced the Security Mortgage loan with a fixed rate loan from Travelers Insurance Company which carried an interest rate of 13.25 percent and included significant prepayment penalties. The Travelers loan was replaced when interest rates later fell in 1987. The Clinic paid Travelers a prepayment penalty of nearly $500,000, and entered into a further loan with First Bank-Billings. This loan has a floating rate of prime plus ¼ percent with a cap of 12 percent on the interest rate.

On December 13, 1985, the Clinic brought this suit against the Pepper-Hamilton law firm, the Peat Marwick Main & Co. defendants, and the Crowley firm defendants (the Seattle consulting firm of Kieburtz and Simmonds was dismissed by the Building Committee in mid-summer of 1982). While litigation was pending, Pepper-Hamilton settled with the Clinic for the sum of $1 million, and the Crowley firm settled for $475,000. The cause went to trial before a jury in the District Court and the jury returned a verdict in favor of the Clinic in the sum of $4,775,000, against defendants Peat Marwick Main & Co. and Donald A. Blackwell. In fixing judgment, the District Court deducted the amount of the previously paid settlements and entered judgment in favor of the Clinic against Peat Marwick Main & Co. and Donald A. Blackwell in the sum of $3,300,000 with costs and disbursements taxed at the sum of $4,626.42. It is that judgment which is on appeal here.

**ISSUES**

The appellants raise the following issues:

1. The eligibility for tax-exempt municipal bond financing is an issue that Peat Marwick defendants were never engaged to examine and that they could not reasonably have been expected to discover. (We rephrase as "the extent of professional duty.")

2. The Clinic's breach of contract claim should have been dismissed because it sounds only in tort. The contract between the Clinic and Peat Marwick did not cover tortious acts or omissions.

3. The Clinic's suit should have been dismissed as time-barred.

4. Peat Marwick defendants are entitled to a new trial because

(a) The District Court excluded rebuttal testimony from defendants expert witness, John McCafferty;

(b) The District Court excluded evidence of substantial tax benefits obtained by the Clinic as a result of the act or omissions of which it complains, which would reduce the damages incurred;

(c) The damages award includes amounts incurred because of the Clinic's failure to mitigate its damages;

(d) The damages award includes unsubstantiated and speculative future damages and,

(e) The District Court allowed the jury to award the Clinic prejudgment interest.

1. The Extent of Professional Duty.

On the professional duty of an accountant, the District Court

in this case instructed the jury as follows:

> It is the duty of an accountant or a partnership of accountants to employ that degree of learning, skill and judgment ordinarily possessed by members of that profession, and to perform any service undertaken as an accountant in the manner a reasonably careful accountant would do under the same or similar circumstances. The failure to perform such duty constitutes negligence.

The foregoing instruction was offered to and given by the District Court without objection. It properly states the law and no issue is raised as to the instructions given by the District Court in this case. The legal and factual issues raised by Peat Marwick (a term we use to include both defendants) revolve around the application and outer extent of the duty of the accountants under the circumstances here.

To begin with, there is a deep division between the parties as to whether the contract between the Clinic and the accountants was express or implied. The District Court properly instructed the jury that an express contract is one in which the terms are stated in words, and that an implied contract is one the existence and terms of which are manifested by conduct. Section 28-2-103, MCA. The distinction is important. Peat Marwick contends that no express contract existed in this case, but only an implied one, and therefore the extent of professional duty must be determined by conduct. The Clinic contends for an express contract, arguing that the Peat Marwick letters and handwritten notes constitute an express contract which defined professional duties.

The special verdict form returned by the jury found only that the defendants did "breach an obligation which they owed to the

plaintiff under a contract."

The issues raised by Peat Marwick on appeal as to whether it breached the duty of accountants in this case follow their concept that only an implied contract existed here and that the scope of their duty to the Clinic is defined by their conduct toward it, and the acceptance of their conduct by the Clinic.

Thus Peat Marwick reports in its brief that in October of 1980 its representatives met with the Clinic's executive committee to discuss the buy-in/buy-out problem. The Clinic was dissatisfied with the Peat Marwick contribution at the meeting and as a result determined it would go elsewhere for advice on the problem. The Clinic informed Peat Marwick that it was unhappy with the firm's tax consulting services in general and that its tax consulting role was probably in jeopardy.

Thereafter, the Clinic set up its Alternative Buy-in Committee under Dr. Gormley. This committee retained the Los Angeles firm of Pepper Hamilton and Scheetz to explore solutions. Peat Marwick was not invited to compete for or to give advice with respect to this consulting opportunity. The only contribution of Peat Marwick to the eventual Pepper report was that its employee, Mac Stephens, supplied earnings and profits figures to Pepper Hamilton in May 1982 for incorporation in their analysis.

The Pepper report came to the Clinic in June 1982. Peat Marwick argues that Dr. Gormley and Bill Nicholson, the Clinic's administrator, went to Peat Marwick and there asked Ronald Haugan for guidance in determining which of the two methods of

11

reorganization contained in the Pepper report would be preferable. They did not then ask Haugan to consider the impact of the proposed reorganization on the issuance of an IRB. Rather, Peat Marwick contends that at the initial meeting Gormley and Nicholson were concerned with the impact of the report on the personal income taxes of each doctor.

The Pepper report was outside of Haugan's expertise, and so he referred the report to Don Blackwell, who is a tax partner of Peat Marwick. Blackwell's review of the Pepper report resulted in his letters to the Clinic dated June 25, July 2, and the hand-delivered letter of August 10, all in 1982. These letters on their face show the review by Peat Marwick only of the tax impact of the proposed reorganization of the corporation upon the doctors personally. The Peat Marwick letters were accepted by the Clinic without objection and no contention is made as to their veracity. Thus, it is argued that the conduct of the parties describes the limits of the duty of Peat Marwick to the Clinic. Peat Marwick contends that the evidence shows that the Clinic relied upon persons other than the Peat Marwick defendants as experts on IRB financing. Peat Marwick was given and performed only piecemeal tasks with respect to the reorganization, and had virtually no involvement at all with the bond issue. The major task of the accountants was the review of the Pepper report, and they worked only with the buy-in committee. In the meantime, the Clinic had hired and relied on Pepper Hamilton, the Crowley law firm, the Kieburtz firm, and its own employees, Bill Nicholson and Peggy

12

O'Leary, to deal with the bond financing and particularly to determine capital expenditures. Peat Marwick's expert witness at trial, Ward Junkermeier, testified that the Clinic was "crawling with authorities on bond issues" and that the Peat Marwick defendants had no occasion to think that they had any responsibility for advising the Clinic with respect to the impact of the reorganization of the proposed IRB.

In addition to their limited sphere of duty in the matter, Peat Marwick also contends that an accountant in Blackwell's position has no duty to warn clients of hazards outside the scope of his engagement, unless he knows the hazards exist. Neither Blackwell nor the other Peat Marwick defendants could have been expected to know that the § 331 reorganization constituted a "capital expenditure," even if they had known of the $10 million limit on capital expenditures under § 103. In support, Peat Marwick points out the Clinic's administrator, Bill Nicholson, who is a CPA, and its comptroller, Peggy O'Leary, also a CPA, failed to detect that there was any question that the reorganization was a capital expenditure, nor did Gareld Kreig of the Crowley law firm.

The arguments of the Clinic on this issue run quite the other way. Dr. Gormley testified that he brought the Pepper report to Haugan for "input" and that in effect he wanted "a second opinion." The Clinic contends for an express contract between the parties, pointing to the sentences in Peat Marwick's letter of June 25, stating, "As requested we have reviewed the [Pepper report] for tax

and accounting considerations" and "We will limit our comments herein to those recommendations in which we see accounting or tax implications." The Clinic also points to a handwritten note from Haugan to Blackwell, in referring to Blackwell the Pepper report, wherein Haugan stated that Dr. Gormley wanted Peat Marwick's "input" later that month, and that the "goals" of the review were to provide the Clinic with a "general reaction to the proposal" and suggestions that Peat Marwick might have from the viewpoint of the Billings Clinic, the individual doctors, and the professional corporation standpoint. Again, the letter of Peat Marwick to the Clinic on July 2, 1982, repeated that the accounting firm had reviewed the Pepper report for "tax and accounting considerations."

Based on the language in the June 25 and July 2 letters, Haugan's note to Blackwell about the goals of the project, and the broad range of topics covered by Blackwell in the June 25 letter, and his handwritten notes, the Clinic's expert witness, Arthur Shenkin, testified that Peat Marwick's duty called for a "complete review of everything in the Pepper report that an accountant would be expected to know;" that Peat Marwick was negligent in failing to consider things which they should have considered; and that the impact of the reorganization on the impending IRB was something that the Peat Marwick firm should have investigated.

The Clinic further argued that the information was available to Blackwell because Peat Marwick's expert in Washington, a Mr. Wiesner, whom Blackwell called in December 1982 as to the effect of the reorganization, was easily available for advice. Moreover

14

the Clinic produced in evidence an in-house Peat Marwick videotape entitled "Action Plan for the 1980s." The videotape called on the tax generalists of the firm to identify clients' problems and refer them to the tax specialists of the firm, to provide those services the clients identify and ask for, and to "anticipate and identify problems that the client may not even be aware of yet." There was no dispute from the experts of either side as to this standard of care.

So, having listed the opposing contentions of the parties, we turn now to determine the issue of the professionals' duty. The factual issues have been decided by a jury. They found a breach of duty by Peat Marwick under a contract existing between it and the Clinic. When the evidence is conflicting, and there is substantial credible evidence supporting the jury's findings, we are precluded from disturbing the factual findings. Jacobsen v. State (1989), 236 Mont. 91, 769 P.2d 694; Palmer by Diacon v. Farmers Insurance Exchange (1988), 233 Mont. 515, 761 P.2d 401; Walls v. Rue (1988), 233 Mont. 236, 759 P.2d 169; and Mountain West Farm Bureau Mutual Insurance Company v. Girton (1985), 215 Mont. 408, 697 P.2d 1362.

Moreover, the factual determination by the jury here makes somewhat irrelevant the issue of whether the contract between the parties was express or implied. The statements in Peat Marwick's letters and notes that they were reviewing for "tax and accounting considerations," and that one of the goals was a "general reaction to the proposal" could be considered as express words constituting

15

an express contract.  Likewise the same language could be defined as conduct defining their duty under an implied contract.

The American Institute of Certified Public Accountants has filed an excellent brief in this case in support of Peat Marwick. As amicus, they too contend that the Peat Marwick defendants here were retained by the Clinic for a limited purpose, to advise as to the tax and accounting considerations of the proposed reorganization, without addressing general business or legal considerations.  There was no letter of engagement between the Clinic and Peat Marwick as to their professional responsibility, and they were never asked specifically to evaluate the reorganization in conjunction with the proposed IRB.

The Institute points to two decisions which it contends should guide our decision here.  In Aetna Finance Company v. Ball (1989), 237 Mont. 535, 774 P.2d 992, we had before us a legal malpractice suit.  Aetna, a finance company, appealed from a judgment of a District Court in favor of an attorney where Aetna claimed that the attorney had not fulfilled his duty to Aetna in connection with Aetna's purchase of a security interest in a parcel of real property.  The defendant attorney had advised Aetna that it should have two exceptions contained in the title insurance policy removed before closing on an additional loan against the property.  The attorney, having been advised by the client that the removal had been done, stated in a post-closing opinion that a valid security interest sufficient to enable Aetna to obtain mortgage title insurance existed.  The attorney did not see the title insurance

16

policy issued the same day, which in fact retained the two exceptions. Aetna sued the attorney claiming it had sustained a loss attributable to a professional error of the attorney. The trial court found that the attorney had assumed only limited duties, which were fulfilled by advising the client how to proceed to insure its interests in the property. The District Court also found that the attorney had not undertaken the duty of guaranteeing that the title company would issue appropriate coverage but that this task was the responsibility of Aetna. The trial court found no liability or negligence on the part of the attorney and on appeal we affirmed. We held that the contract terms determining the exact duties agreed to between the attorney and the client were ambiguous, and so we held the trial court could ascertain the intent of the parties from the examination of their conduct. Based on the evidence, we upheld the District Court in that the attorney could not be held liable for the exceptions that appeared in the title insurance policy.

The Institute also relies on Gantt v. Boone, Wellford, Clark, Langschmidt and Pemberton (M.D. La. 1983), 559 F.Supp. 1219, affrmd 742 F.2d 1451 (5th Cir. 1984). In that case the federal court refused to impose liability on negligence or breach of contract against an accountant hired by a corporation in connection with the sale of corporate assets that resulted in substantial state capital gains taxes. The court focused on the accountant's testimony as to his understanding of his duty, the amount of his fee, and on specific matters that he was not asked to consider. The court

concluded that the accountant had undertaken a limited engagement and that he was not retained for the purpose of rendering tax advice which had been left to the corporation's general counsel. The _Gantt_ court disregarded the testimony of the plaintiff's expert, an accountant who testified that he would have done a number of things differently from the defendant accountant. The court held that any further actions by the accountant would simply have duplicated the effort of the corporation's general counsel and were not in the sphere of duty of the accountant in that case.

The Institute cites other cases of equal import, but we distinguish the two principal cases and the other cases from the case at bar. In the two cases cited, the trier of fact determined the scope of the professional's duty; that is also true in the case at bar. Moreover, in spite of the restricted view of the accountants' duty that was taken by the Institute with respect to Peat Marwick's participation in this case, Peat Marwick was not completely isolated from the IRB financing project. The Pepper report itself contained a reference to the fact that the Clinic would probably build with IRB financing, and this report was fully available to Peat Marwick. In addition, during the summer of 1982, Peat Marwick performed audit work in connection with the reorganization, and knew from the minutes of The Yellowstone Realty, as well as the records of The Yellowstone Company that the reorganization was on-going, and the construction was planned. The audit was for the purpose of completing the reorganization.

We uphold the determination of the jury that Peat Marwick

breached its duty with respect to the Clinic.

2. Contract Claim Versus Tort Claim.

Peat Marwick presents this issue in two phases, (1) the Clinic's contract claim sounds only in tort and should have been dismissed, and (2) that given the conduct of the parties, the implied contract between the Clinic and Peat Marwick defendants cannot reasonably be interpreted as having required the Peat Marwick defendants to consider the impact of the reorganization on the proposed IRB financing.

Under the first phase of this issue, Peat Marwick contends that the gravamen of the Clinic's claim is one in tort, a claim that Peat Marwick did not perform with due care their obligation to review the Pepper report. Peat Marwick states that the Clinic's claim here is solely a tort action, and not a contract claim.

The principal citation for this position asserted by Peat Marwick is Erickson v. Croft (1988), 233 Mont. 146, 760 P.2d 706. In that case the purchaser of ranch property brought suit against a real estate broker for fraud, negligence and breach of implied contract, and against an attorney and law firm for malpractice. In the District Court both defendants moved separately for summary judgment based on the applicable statutes of limitation and the District Court granted summary judgment against the plaintiff in that the claims were timed-barred.

In granting summary judgment, the District Court in Erickson, above, determined that the essence of the causes of action alleged by Erickson was common law fraud and negligence, and that the claim

19

under a contract theory was merely a "rehashing" of the fraud and negligence claims. The statute of limitations had run on both the fraud and negligence claims. Sections 27-2-203 and 27-2-204, MCA. Erickson claimed that his claim was based on an implied contract between him and the real estate broker. The District Court held that regardless of the possibility of the existence of an implied contract claim, under the nature of the claim asserted, the action was based on fraud and negligence, so that the longer statute of limitations applying to implied contracts, § 27-2-202, MCA, did not apply. This Court affirmed on appeal. Peat Marwick relies on this case, contending that the Clinic's contract claim is "nothing more than a relabeling of the Clinic's negligence claim." See Erickson, 760 P.2d at 710.

There is in truth sometimes a thin distinction drawn between whether an action is grounded in tort or a contract. Generally, the test of distinction seems to be that if the claim is based on a breach of specific terms of the contract without any reference to the legal duties implied by law upon the relationship created thereby, the action is in contract; whereas, if there is a contract for services which places the parties in such relation to each other that in an attempt to perform the promised service, a duty imposed by law as a result of the contractual relationship is breached, then the gravamen of the action is the breach of the legal duty rather than a breach of the contract, and so is a tort. See Brueck v. Krings (a case in which Peat Marwick was involved) (Kan. 1982), 638 P.2d 904, 907; Yeager v. Dunnaven (Wash. 1946),

174 P.2d 755; Sato v. Van Denburgh (Ariz. 1979), 599 P.2d 181, 183.

We also said in Erickson, above, distinguishing a holding in Unruh v. Buffalo Building Company (Mont. 1981), 633 P.2d 617, 618, that the "gravamen of the claim and not the label attached controlled the limitations period to be applied to that claim." 760 P.2d at 710.

In Thiel v. Taurus Drilling Ltd. (1985), 218 Mont. 201, 710 P.2d 33, we held that under certain circumstances, potential liability in tort may coexist with liability in contract, when the facts warrant either form of action. In this case, Peat Marwick perceived it had duty, express or implied, to review the Pepper report "for tax and accounting considerations." The jury found that in failing to note the impact of the reorganization upon the IRB financing, Peat Marwick had breached its express or implied contract. By the same token, since a professional contract existed between the parties, the law imposed upon Peat Marwick the duty of employing that degree of learning, skill and judgment ordinarily possessed by members of the accounting profession, in the manner a reasonably careful accountant would do under the same or similar circumstances. Thus, whether looked at from the viewpoint of breach of contract, or from the breach of a duty imposed by law upon the performance of the contract, the allegations of the claims in this case can be stated either in tort or in contract. Such a result seems not to be uncommon. Hawkins, in Professional Negligence Liability of Public Accountants, 12 Vand. Law Review 797 (1959), an authority relied on by Peat Marwick, said:

> Like other professionals, the accountant usually gets into the position where he must exercise his professional skill as the result of a contract. The contract says what he has undertaken to do, but the law says that he must do it with reasonable care, by professional standards. If he fails, he may be liable either for breach of his contract or in tort, for breach of the general duty to exercise due care arising out of the contract relationship.

We cannot therefore agree with Peat Marwick that the Clinic had only a single form of claim against the Peat Marwick defendants. A scissors more sharp than we command is required to pare away the contract implications from the tort claim here. The claims exist mutually in contract and in tort. The District Court was correct in refusing to dismiss the action on the grounds urged by Peat Marwick.

Under the same issue, and almost in the same breath, Peat Marwick argues that the implied contract between the Clinic and Peat Marwick defendants could not reasonably be interpreted as requiring the Peat Marwick defendants to consider the impact of the reorganization on the IRB.

Again, Peat Marwick argues that since the Clinic and Peat Marwick never actually negotiated or agreed to language defining the scope of Peat Marwick's engagement, an express contract did not exist. It argues that an implied contract can exist only where the terms are manifested by conduct. In support, they point to the sentence in the June 25, 1982 letter to the Clinic in which Peat Marwick said "As some of Pepper, Hamilton, and Scheetz's recommendations relate to general business and legal considerations, we will limit our comments herein to those

22

recommendations in which we see accounting or tax implications." This is but a repetition of the earlier argument, phrased in another form. It all comes to one. Either under the contract, express or implied, the duty to review for tax and accounting considerations included a duty to recognize the impact of the proposed reorganization upon the IRB financing; or from the tort viewpoint, it became the duty of Peat Marwick in examining the tax and accounting considerations, to exercise the due professional care ordinarily required of members in that profession. Under the circumstances here, the jury has decided those factual issues, whether in contract or tort.

3. Statutes of Limitations.

Peat Marwick takes the position that the claims of the Billings Clinic against Peat Marwick are time-barred.

The pertinent dates are these: The Clinic took steps to begin its reorganization on September 1, 1982; the reorganization became final on September 30, 1982; the industrial revenue bond issue was abandoned as impossible on December 16, 1982; the Clinic filed its complaint against Peat Marwick defendants (and the settling defendants) on December 13, 1985.

Thus, if the two-year statute, § 27-2-207, MCA, applies, the Clinic's complaint was a year late in its filing; if the three-year statute, § 27-2-204, MCA, applies, the Clinic's complaint was days late if September 30, 1982, or an earlier day was the date when the injury accrued; if the Clinic's action was founded upon an implied contract, there was a five-year period of limitation,

and if an express contract, an eight-year period, § 27-2-202, MCA.

Let us get immediately to the heart of this issue. We have said in the foregoing that under the facts in this case the claims of the Billings Clinic against Peat Marwick coexist mutually in tort or contract. The shortest statute of limitations for contracts is § 27-2-202(2), MCA, prescribing a five-year period for an action upon a contract, account or promise not founded under an instrument of writing. The Billings Clinic lawsuit was filed well within this period.

In Thiel v. Taurus Drilling Ltd. (1985), 218 Mont. 201, 710 P.2d 33, this Court stated that where there is a substantial question as to which of two or more statutes of limitation should apply, the general rule is that the doubt should be resolved in favor of the statute containing the longest limitation. We reaffirmed that rule in Weibel v. Ronan State Bank (1989), ___ Mont. ___, 776 P.2d 837, 838, saying:

> . . . If the gravamen of the action is such that it may rest in either a tort or contract, the injured party may elect the theory he will pursue and the statute of limitations governing the elected theory will apply. (Citing authority.) If doubt exists as to the gravamen of the action, the longer statute of limitations will apply. (Citing Thiel.)

In this case, the District Court applied the three-year statute of limitations for tort actions, § 27-2-204, MCA, and found that the cause of action had accrued on December 16, 1982. This brought the filing of the complaint by Billings Clinic within the three-year period. On appeal, Peat Marwick claims error, on the grounds that the cause of injury accrued on September 1, 1982, when

24

the reorganization commenced, or, alternatively, on September 30, 1982, when it became irrevocable. There is no need for us to discuss that issue, nor to discuss the claim of Peat Marwick that this cause constituted an injury to property and therefore that a two-year statute, § 27-2-207 applied, because in our view the five-year statute of limitations was equally applicable under the facts of this case. Section 27-2-202(2), MCA.

4(a). The Exclusion of Rebuttal Testimony From Expert John McCafferty.

John T. McCafferty is a Dallas, Texas, attorney with an extensive background in municipal bond financing both as a Treasury Department employee for several years and as a practicing lawyer in Dallas and in Washington, D.C. He testified in the trial before the District Court, without objection, to his opinion, based upon his professional experience with accountants, that Don Blackwell should "absolutely not" have recognized the potential IRB problem under § 103. Further on in his testimony, the District Court sustained an objection to his proffered testimony that because of the passage of the 1986 Tax Reform Act by the Congress, it was likely that the holder of the proposed IRB bonds for the Clinic would call them in 1992. (The offer from Security Mortgage Company to the Clinic had specified that the IRB bonds would be callable, at the option of the holders, in 1992.) The Clinic's expert, Arthur Shenkin, and others, had testified that such bonds would not have been called. The District Court sustained an objection to Mr. McCafferty's testimony as an expert on this point on the grounds

that this part of his expert testimony had not been revealed to the Clinic in pre-trial discovery.

The question of McCafferty's proposed testimony as to whether the IRB bonds would be called up in 1992 arose in an unorthodox way. On cross-examination of Shenkin by counsel for Peat Marwick, he was asked whether he had considered the implications of § 265 of the Tax Reform Act of 1986 and other implications of that Act. Shenkin testified that he did not consider them because they were not relevant. Peat Marwick contended that the testimony of McCafferty would show that such considerations were relevant. In effect Peat Marwick sought to rebut its own cross-examination on a matter of expertise through an expert that had not been designated. The court posed the issue in this fashion:

> THE COURT: It is just a question of whether it is rebuttal or not rebuttal. So it gets down to a technical question as to whether you can raise the matter by cross examination, then, depending on the answer from the witness which you believe is an incorrect answer, that you can then, under this circumstance we are dealing with, bring forth rebuttal testimony or attempt to establish that it would have made a difference. That's really where we are here?

The court then went on to sustain the objection.

On appeal Peat Marwick contends that the proffered testimony by McCafferty was only rebuttal to specific testimony that Shenkin gave during the trial and that it tended to counteract new matters offered by the adverse party. McGee v. Great Northern Inc. (1977), 174 Mont. 466, 480, 571 P.2d 784, 792.

Before the trial, on April 24, 1987, the District Court had entered an order requiring disclosure of expert witness testimony

by January 15, 1988, and establishing a discovery cutoff date of May 1, 1988. The Peat Marwick defendants designated Mr. McCafferty as an expert witness on time, supplemented his designation on June 17, 1988, but did not in that designation mention the proposed 1986 Tax Reform Act testimony. The ruling of the District Court on this part of McCafferty's testimony is proper.

Under Rule 26(b)(4), M.R.Civ.P., a party may be required to state the subject matter on which a proffered expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. Peat Marwick had not identified the Tax Reform Act of 1986 as a subject for Mr. McCafferty's testimony. Moreover his proffered testimony could not be considered rebuttal because rebuttal testimony is confined to that evidence which tends to counteract new matter offered by the adverse party. Massman v. City of Helena (1989), 237 Mont. 234, 773 P.2d 1206; Mountain West Farm Bureau Mutual Insurance Company v. Girton (1985), 215 Mont. 408, 697 P.2d 1362. Here the "new matter" was brought out by Peat Marwick. We uphold the District Court's ruling.

Peat Marwick also claims here when the District Court refused further testimony by Mr. McCafferty that a pamphlet written by Shenkin in 1973, "Transfers to Partnerships," contained an outline of a transaction similar to the reorganization of the Billings Clinic, but Shenkin did not warn the reader that such a transaction would constitute a capital expenditure under § 103. The Clinic objected to the proposed testimony of Mr. McCafferty again because

27

the Peat Marwick defendants had not designated the testimony prior to trial and because the evidence did not rebut new matters raised by the Clinic but rather constituted undisclosed expert evidence presented in their own case-in-chief. The trial court sustained the objection.

The pamphlet itself was not offered as an exhibit by Peat Marwick. On his cross-examination, Shenkin had admitted that it did not warn readers of the potential implications of § 103 in IRB financing. Shenkin also stated that he was not sure if there was a capital expenditure limitation for IRBs in effect in 1973 when he wrote his pamphlet. It is clear from Shenkin's testimony on direct examination and on cross-examination that the pamphlet he had authored was directed to the tax implications of transfers to partnerships, a subject which had no relation, for the purpose of his pamphlet, to the parallel subject of IRB financing under § 103. The District Court was clearly correct in refusing McCafferty's testimony on this subject also.

4(b). Whether the Clinic Inflated its Damages.

Under the offer for the proposed IRB from Security Mortgage Company, the Clinic would have been committed to make regular monthly interest payments to the bond holders during the time the bonds were outstanding. When the bond issue failed, the Clinic obtained a private loan from Security Mortgage which also required such monthly payments. It appears, however, that the Clinic did not make regular monthly payments for the first two years, but instead allowed the amount of accruing interest to be added to the

principal balance of its loan. This had the result of increasing its loan balance, and increasing the damages claimed by the Clinic. The amount of the financed interest was $957,775, which was added to the loan balance carried over to the Travelers loan. The Clinic claimed damages for the additional balance and for the increased interest attributable to it in the approximate sum of $500,000.

Peat Marwick claims that by so handling its loan payments, the Clinic inflated the damages when it had a duty to mitigate damages, relying on Brown v. First Federal Savings & Loan Association (1969), 154 Mont. 79, 460 P.2d 97, where this Court held that there could be no recovery for damages which might have been prevented by the reasonable efforts of the claimants.

The Clinic counters that under the evidence, the Clinic did not "elect" not to make regular monthly interest payments. It points to the testimony given by Peat Marwick's damages expert, David Johnson, that whether the IRB financing had been completed or the actual Security Mortgage loan were in effect, in each case there would have been a two-year period in which the loan proceeds would have been used to pay interest expense. If an IRB had been used, the interest earned on the bond proceeds during the construction period would be used to pay both construction costs and the accruing interest expense owed to the bond holder. The Security Mortgage loan on the other hand was a construction loan in which the lender provided the Clinic with a line of credit out of which construction costs, including interest expense, as they were incurred, were to be paid. Because the Clinic did not receive

29

the full $7.5 million at the outset from Security Mortgage as it would have received under the bond financing plan, the Clinic did not receive interest income on the loan proceeds during the construction. It was immediately obligated to pay interest on the loan on amounts as received up to $7.5 million. Moreover the difference in interest rates under the two procedures (prime plus 1 percent versus 75 percent of prime) entered into the equation.

That the Security Mortgage loan was reasonable, and the best loan available at the time, as were the Travelers and First Bank replacement loans, was testified to by the experts presented by the Clinic. No evidence in the record shows that substitute conventional loans other than IRBs would have provided the Clinic with funds where interest could have been earned during the construction, or that the terms of the Security Mortgage loan permitting the "financing" of interest expense by the Clinic were improper or unreasonable.

Mitigation of damages is an affirmative defense for which the burden of proof falls on the party opposing the damages. A. T. Klemens and Son v. Reber Plumbing and Heating Company (1961), 139 Mont. 115, 360 P.2d 1005, 1010. The question was one for determination by the jury which awarded the damages. The District Court upheld the jury in denying Peat Marwick's motion for a new trial. We find no basis on which to reverse or modify the judgment on this item.

4(c). Offsetting Tax Benefits.

Peat Marwick contends that since the jury found it liable for

the damages caused to the Clinic by the loss of the IRB, Peat Marwick is entitled to an offset of the tax benefits that the individual doctors received by proceeding with the reorganization. These benefits had a present value in 1982 of approximately $311,000. The District Court refused to permit this testimony from defendant Don Blackwell.

Peat Marwick contends that a damages award for a tort or a breach of contract may be offset by the benefits received by the plaintiff from the complained-of transaction. ECA Environmental Management v. Toenyes (1984), 208 Mont. 336, 348, 679 P.2d 213, 219, and Restatement (Second) of Torts, § 920, (1979) (stating that when defendant's tortious conduct confers a special benefit on the individual or plaintiff that was harmed, the value of the benefit may be considered a mitigation of damages when equity requires). Peat Marwick also contends that virtually all of the doctors were in the 50 percent marginal income tax bracket in 1982 for federal income tax purposes, and that the maximum tax rates are now 28 percent. Peat Marwick argues that the doctors have realized a permanent tax benefit consisting of the difference between those two rates. The District Court refused to allow Peat Marwick to present any evidence of the tax benefits thereby conferred on the individual doctors.

Peat Marwick is not entitled to such an offset. The objective of compensatory damages is to restore to the injured or damaged party the position or state the party would have attained had the tort or the breach of contract not occurred. In this case, as the

31

jury found, if Peat Marwick had properly done its job, the Clinic would have had the benefit both of the tax benefits arising from the reorganization through stepped-up depreciation allowances, and also the lower cost of the favorable tax-exempt status of IRB financing. (Testimony showed that if the Clinic had been alerted to the ramifications of IRB financing under § 103, the reorganization would have been delayed a period of three years to eliminate the capital expenditure problem, but the IRB financing would have proceeded immediately.) Without doubt, the failure of the IRB financing resulted in a higher interest cost for the loans required for the construction of the addition to the Clinic. To reduce that higher cost by the tax benefits to which the Clinic was otherwise by law entitled would do no equity. The two items are not related so that one benefit is the result of the other. The Clinic has cited Randall v. Loftsgaarden (1986), 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525, for the rule that a plaintiff's recovery for rescissionary damages under the Securities Act of 1933 should not be reduced by the amount of tax benefits obtained by the plaintiff as a result of the fraudulently-induced investment. While Randall is applicable in a fashion, it is based on the public policy of the federal government to award damages to deter fraud in securities cases. In the ordinary course of things however, tax benefits come to individuals by force of federal or state governmental laws and not through the beneficence of nongovernmental third parties. This Court has refused to acknowledge tax benefits as offsets in Anderson v. Burlington

Northern Inc. (1985), 218 Mont. 456, 464, 709 P.2d 641, 648, cert.denied 106 S.Ct. 2902 (1986); and Tribby v. Northwestern Bank of Great Falls (1985), 217 Mont. 196, 209, 704 P.2d 409, 417. In Ehly v. Cady (1984), 212 Mont. 82, 97, 687 P.2d 687, 694, this Court allowed a plaintiff to recover lost investment tax credits that were supposed to be a major benefit of his bargain. The damages suffered by the Clinic in this case were the loss of the IRB financing, and the accompanying result of lower interest costs to the Clinic. That loss was real, and quite separate from any gained realized by the Clinic (and passed through to the doctors) from the reorganization.

The foregoing position also prevents any consideration by us or by the District Court that the income tax rates in 1986 were reduced from a 50 percent top to a 28 percent maximum, as contended by Peat Marwick. Evidence of the tax benefits to the individual doctors would be speculative in the extreme, assuming without agreeing that it would be proper to look to the partners individually, instead of the partnership entity known as the Clinic. This Court prophetically stated in Bracy v. Great Northern Railway Company (1959), 136 Mont. 65, 74, 343 P.2d 848, 853, "The tax liability of today is no criterion of what it may be tomorrow. It has a faculty of constantly increasing in the face of vocal threats of reduction usually made on the evening of an election." The rule that damages must be reasonably certain in their nature and origin applies with equal force to claimed offsets to damages. We find no merit in these issues.

33

4(d). Future Damages.

Arthur Shenkin projected damages to be sustained by the Clinic in the future to December 2002 based upon the supposition that the IRB would not have been called in 1992. Shenkin also calculated however that if the bonds were called on December 1, 1992, and replaced by conventional financing, the Clinic's damages would have been $4,316,545.

In determining whether the IRBs would not have been called in 1992, Shenkin testified that he relied on the expertise of Jerry LaSeur of Security Mortgage for this purpose.

LaSeur had testified that an IRB is "called" if the existing bond holder no longer wants the bond and if a purchaser cannot be found to replace the existing bond holder. If the bond is purchased by a new bond holder, the bond has not been "called," and its tax-exempt status continues. LaSeur testified that because of the credit quality of the Clinic and the earnings situation of the proposed bond holder, First Interstate Bank of Arizona, that a call of the bond by First Interstate would be remote. LaSeur testified that almost with no doubt he could replace the bond with a buyer in need of tax-exempt income if First Interstate decided to shed itself of the bonds.

Peat Marwick objected to Shenkin's testimony for relying on LaSeur, because LaSeur's testimony was speculative, as to what might occur in the future, and because whether the bonds would be called by First Interstate was not within the expertise of LaSeur. If the trial court had sustained the objection, the damages under

Shenkin's testimony might have been reduced by approximately $500,000. The District Court, however, overruled the objection.

In arriving at the year 2002 damages in the amount of $4,827,945, Shenkin assumed that the bonds would not be called in 1992, based on LaSeur's opinion.

The jury verdict on damages was the sum of $4,475,000, between the high and low figures given by Shenkin.

By law, damages must in all cases be reasonable, § 27-1-302, MCA, and damages which are not clearly ascertainable both in their nature and origin cannot be recovered for a breach of contract, § 27-1-311, MCA. The amount of damages however need not be proven with mathematical precision, Jarussi v. Board of Trustees of School District Number 28 (1983), 204 Mont. 131, 664 P.2d 316. The amount of future damages rests in the sound discretion of the trier of fact and need only be reasonably certain under the evidence. Frisnegger v. Gibson (1979), 183 Mont. 57, 598 P.2d 574. The question presented on this issue is whether the approximately $500,000 of additional damages testified to by Shenkin that would be incurred if the bonds were not called in 1992 was established with reasonable certainty. The testimony indicated that the present loan with First Bank-Billings will stay in effect because the loan is a good earning asset for the Bank and the Clinic is a desirable customer. Moreover the Clinic is not likely to obtain a lower rate than prime plus ¼ percent. LaSeur testified that the tax-exempt status of the IRB bonds would most likely have continued until 2002. The evidence made it reasonably certain for the jury

to assume that the bonds would not be called in 1992, and that the damages incurred by the Clinic would therefore continue until the payoff of the First Bank loan in 2002. The amount of future damages were discounted to present value under Shenkin's testimony.

We find no reason to disturb the jury's finding on this portion of the damages.

4(e). Moratory Interest Versus Pre-Judgment Interest.

Shenkin's testimony indicated that the Clinic had been forced to make $834,533 in higher interest payments from January, 1983 to August, 1988. He increased this amount to $976,609, by adding in the "present" value as of August 1, 1988 (the date of trial), of the past interest payments. The "present" value calculation was $142,076.

The Peat Marwick defendants contend that this item is pre-judgment interest, for which there is no statutory authority. They state that under § 27-1-210, MCA, and § 27-1-211, MCA, pre-judgment interest is available only if the damages are "capable of being made certain by calculation." Peat Marwick contends that this Court interprets that language narrowly, Carriger v. Ballenger (Mont. 1981), 628 P.2d 1106, 1110, and that pre-judgment interest is routinely denied when there is conflicting evidence on the amount of damages, Castillo v. Franks (1984), 213 Mont. 232, 244, 690 P.2d 425, 431; Swenson v. Buffalo Building Company (Mont. 1981), 635 P.2d 978, 985; and Callihan v. Burlington Northern Inc. (1982), 201 Mont. 350, 359, 654 P.2d 972, 977. On the basis that the future interest damages were not a sum certain or capable of

36

being made certain by calculation, but required expert testimony, Peat Marwick asserts that the award of $142,076 as a present value calculation for additional future interest was unwarranted.

In reply, the Clinic states that the Peat Marwick argument misconstrues the item of damages. The Clinic contends that the jury award was moratory rather than pre-judgment interest. In support, the Clinic cites the testimony of Shenkin that the Clinic actually paid $834,533 more in interest between January 1983 and July 1988 than it would have paid if the IRB had been issued. Because the Clinic had to make higher periodic payments, Shenkin testified that the Clinic lost the opportunity to use those funds for other purposes, to increase its cash flow, or to invest those funds. Thus in addition to the actual loss of the dollars, the lost use of those moneys "cost the doctors something." Shenkin calculated the additional amount that each of the monthly payments would have gained up to the date of trial if invested in an investment at a rate of return equal to the fifteen-year average of the one-year Treasury Bond Index. In effect, the item claimed was for the loss of use by the Clinic of the increased costs it had already paid because of the failure of the IRB bonds.

When viewed from the prospect of the loss of use of the increased interest expense which the Clinic had to pay, the amount claimed as moratory interest does not exceed the limitation of damages for the breach of an obligation set forth in § 27-1-303, MCA, that no person can recover a greater amount of damages for the breach of an obligation than he or she could have gained by the

full performance thereof on both sides. Again, the increased interest already incurred at the time of trial appears to be reasonably certain, and is capable of reasonable calculation. Accordingly, we find no error on this item.

**CONCLUSION**

Having considered in full the issues raised by Peat Marwick defendants on appeal and finding no error therein, we affirm the judgment of the District Court.

_John L. Sheehy_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_William E. Hunt Sr._

_R. C. McDonough_

_Fred J. Weber_
Justices

Justice L. C. Gulbrandson:

I concur in the result but not in all that is said in the Opinion.

_L. C. Gulbrandson_
Hon. L. C. Gulbrandson, Retired
Justice, sitting in place of
Justice Diane G. Barz

38