No. 98-577

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 272

296 Mont. 474

989 P.2d 818

ROGER GRENFELL,

Plaintiff and Respondent,

v.

GARY ANDERSON, individually, GARY

ANDERSON, d/b/a PG&L MARKETING,

INC., and PG&L, INC.,

Defendants and Appellants.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Douglas G. Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Linda Osorio St. Peter, St. Peter & Warren, Missoula, Montana

For Respondent:

P. Mars Scott, Mulroney, Delaney & Scott, Missoula, Montana

Submitted on Briefs: March 18, 1999

Decided: November 9, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶ **Defendants and Appellants Gary Anderson and PG&L, Inc. (Anderson) appeal from a judgment by the Fourth Judicial District Court, Missoula County, in favor of Plaintiff and Respondent Roger Grenfell (Grenfell). Following a bench trial, the District Court ordered that the lease agreement between the parties was terminated, and Grenfell was entitled to $4,148.78 in damages for unpaid rent and utilities, as well as attorney's fees and costs. The District Court further concluded that Anderson had failed to present credible evidence to support his claim for damages.**

¶ **We affirm in part and reverse in part and remand for further proceedings.**

¶ **We consolidate and review the following issues raised by Anderson on appeal:**

1. Did the District Court err in concluding that in the absence of controlling provisions in the lease mailing a certified letter provided Anderson with actual notice?

2. Did the District Court err in concluding that Anderson had constructive notice of the contents of the October 17, 1991 certified letter?

3. Did the District Court err in calculating damages resulting from Anderson's failure to cure his defaults?

4. Did the District Court err in concluding that Anderson did not present credible evidence to support his claim for damages?

## Background Facts

¶ **On January 18, 1989, Grenfell, the lessor, and Anderson, the lessee, signed a commercial lease agreement for property located on 3213 Brooks Avenue in Missoula, Montana. The leased premises were part of Grenfell's property from which he operated his own paint and glass business.**

¶ **The term of the lease was for three years, from February 1, 1989, to January 31, 1992. Rent included payment of $800.00, which would increase pursuant to a cost-of-living index provision. At the time relevant to the claims in this law suit, the base monthly rent was $884.00 per month. Additionally, Anderson was obligated to pay a one-third share of utilities and maintenance "due as rent on the first of each month following Lessor's notification of such expenses to Lessee." All rental payments were due "in advance on or before the first day of each month for which the payment is due." If payments were not received within 10 days, a $25 late penalty could be assessed; payments overdue beyond 30 days could be assessed an interest penalty of 12 percent.**

¶ **On June 15, 1990, the parties signed an addendum, which clarified the handwritten option found beneath the signature lines of the original lease. The addendum stated that "Both parties agree that the first five year option commences on February 1st, 1992." The addendum does not provide for how the option would be exercised, whether orally, in writing, or by some other action or inaction on the part of Anderson. Although the record indicates that the parties contemplated an additional five-year option, the foregoing is the only written documentation of an option agreement between the parties.**

¶ **Critical to the dispute is a mutual covenant found in the lease agreement that stated if the lessee, Anderson, was in default at any time for the failure to pay rent or otherwise perform under the lease, and failed "to remedy such default within . . . 10 days after written notice thereof from Lessor," then it was:**

> [L]awful for Lessor to enter upon the leased premises, and again have, repossess and enjoy the same as if this lease had not been made, and thereupon this lease and everything

contained herein on the part of Lessor to be done and performed shall cease and terminate, without prejudice however, to the rights of Lessor to recover from Lessee all rent due up to the time of such entry . . .

The method for providing this written notice was not described in the lease. Anderson's address found in the lease agreement is "1937 Ernest" Avenue, in Missoula. It is not clear from the record whether this address pertained to a business operated by Anderson, or was ever contemplated as a designated mailing address by the parties. The record indicates, however, that invoices for utilities and rent, as well as other communications were either hand delivered or mailed to Anderson at either the leased premises, or at other businesses operated by Anderson in Missoula.

¶ **The lease also contained a provision that "[t]his Lease Agreement shall not be assignable by Lessee without the prior written consent of the Lessor." The lease provided no such restrictions on subleases. Also, a covenant required that "Lessee's use of the premises is subject to Lessor's prior approval, as is any subsequent change of use by Lessee." Precisely what "use" was contemplated by the parties, or what would be deemed a "change in use," or what constituted "approval," or how this approval would be obtained, was not expressed in the lease. The record indicates that the parties are in agreement that the property would be used for commercial purposes only.**

¶ **Precisely how the parties dealt with each "change of use" by Anderson is mixed. From the start of the lease, Anderson occupied only half of the entire leased premises. He operated a business *Pictures, Pictures*, a poster and framing shop. With Grenfell's apparent approval--there is no evidence that it was in writing--Anderson leased the other half of the premises in February of 1989 to Rick Bice (Bice), who operated a print shop. This sublease was a month-to-month tenancy, and no written agreement was executed between Anderson and Bice. With Grenfell's approval, a partition between the two businesses was erected, dividing the premises in two.**

¶ **In February of 1991, Anderson relocated his business, *Pictures, Pictures,* to a nearby building. At this time, invoices for rent and utilities continued to be either hand delivered--usually by one of Grenfell's employees--or mailed to Anderson's new business location. It is apparent that formal approval was not sought or given for this move. It is equally apparent that Grenfell was aware of the move and did not express any objections.**

¶ **Upon moving from the premises, Anderson sublet his half to George Fritz (Fritz), who planned to open a take out pizza business. The record indicates that, again, approval for this sublease or use of the premises was neither sought nor given. Testimony elicited at trial indicates that Grenfell became aware through sources other than Anderson that another tenant was preparing to use the premises. Grenfell had previously testified that another retail business would "probably not" be a change of use in the premises. By late summer of 1991, Fritz had not yet opened the business. Due to Fritz's problems in complying with the sublease agreement,**

Anderson canceled the lease and sought to lease the entire premises to Bice. This offer was refused and the premises remained vacant.

¶ On October 20, 1991, Anderson executed a five-year sublease agreement with Richard Houldson (Houldson), who intended to operate a computer equipment repair shop. The agreement, signed by both parties, was for the entire premises, and would have taken effect December 1, 1991. Anderson then sent written notice to Bice, dated October 24, 1991, he had rented the entire building, and Bice had 30 days to vacate. In turn, the record indicates that shortly thereafter Bice informed Grenfell of this notice, apprising him that Anderson intended to terminate the month-to-month tenancy with Bice, and sublease the entire premises to another tenant. Anderson informed Grenfell of this as well, sometime in early-to-mid November. The record shows that Grenfell, with notice of this potential change in use of the premises, did not give his approval prior to Houldson taking possession. To the contrary, Grenfell had already chosen a course of action that would serve as an ultimate rejection of Anderson's sublease with Houldson.

¶ The record indicates that on October 17, 1991, Grenfell sent a notice of default via certified mail to Anderson's address at 1937 Ernest Avenue in Missoula. The notice stated that Anderson was in default for failure to pay October rent, and past-due utility bills, and Anderson had until October 28, 1991, to bring the balance current or Grenfell would "take possession of the building and its leases." Although not listed specifically, the record indicates that Grenfell's calculations included May through September utilities, late penalties, and interest. The record further indicates that it was undisputed at the time that Anderson owed May, June and August utilities. Anderson would later claim he did not receive a notice for July utilities, and that September utilities had not yet been invoiced, and therefore he was not in default for these amounts. The certified letter was returned to Grenfell "unclaimed." The record provides no evidence that a person at the Ernest Avenue address actually rejected the letter.

¶ Noteworthy, is the fact that Grenfell had, on one other occasion in late 1989, served default notice by certified mail on Anderson at the Ernest Avenue address. This notice was returned unclaimed as well, although the parties were able to later reconcile past due rent between themselves.

¶ On October 28, 1991, Grenfell changed the locks on the leased premises. At that time, Grenfell had made no other attempts to provide Anderson with written notice of the alleged default. The next day, Grenfell sent a letter to Bice, Anderson's sublessee, instructing him to remit rent and utility payments directly to Grenfell. Grenfell maintains that pursuant to the express terms of the lease agreement, his right to repossess included the right to take over any lease agreement that existed at the time between Anderson and other parties.

¶ On that same day, October 29, 1991, Anderson (allegedly unaware of the lockout) sent Grenfell notice that Grenfell was in default for not providing heating and air conditioning, and had damaged Anderson through his "direct tampering" with Anderson's sublet that allegedly hurt

"any ongoing negotiation with sublet." Allegedly, Grenfell had also "discouraged a second sublet to abandon his sublet agreement" although the letter does not mention the sublet by name.

¶ Grenfell then served another default notice on Anderson on October 30, 1991, essentially making the same allegations as the October 17, 1991 notice, although the utility bill was reduced from $921.63, to $719.10, after Grenfell chose not to pursue late penalties and interest fees. This notice was personally served on Anderson at one of his places of business.

¶ As of November 9, 1991, Anderson had tendered payment for all but the July and September utilities, which remained in dispute. Anderson, in fact, made this lingering dispute clear in a letter to Grenfell dated November 6, 1991. The issue of whether Anderson received proper notice of July and September utilities, and therefore cured the undisputed portion of the default, as identified in the October 30, 1991 notice, currently remains in dispute, although Anderson undeniably is obligated to pay these bills.

¶ On November 15, 1991, Anderson sent notice to Bice that he, Anderson, was not in default with Grenfell, and that rent under the sublease was due--which Bice apparently had remitted to his attorney in light of the ongoing dispute. Eventually, by court order, Bice would pay rent to the court pending the outcome of this litigation. Anderson also sent a letter to Grenfell, on November 15, demanding a key to the premises and for Grenfell to cure "all defaults." Grenfell asserted at trial that the new keys to the premises were at all times available to Anderson at Grenfell's place of business--on condition that Anderson cure the default. The District Court found that Grenfell did not advise Anderson of this, although Grenfell testified that on the day the locks were changed, he left phone messages for Anderson at three different locations. Grenfell testified further that if Anderson had cured his default, at any time following the lockout, he could have retaken possession.

¶ On November 25, 1991, Grenfell filed suit against Anderson, alleging breach of the lease agreement, unlawful detainer, and violation of the implied covenant of good faith and fair dealing. Grenfell was granted a temporary restraining order that day against Anderson. The order prevented Anderson from terminating his sublease with Bice, and, consequently, from subleasing to Houldson. On January 16, 1992, the District Court granted Grenfell's preliminary injunction, which provided the same restraints on Anderson as the temporary restraining order, pending the outcome of this litigation.

¶ On February 21, 1992, Anderson filed his answer and counterclaim, which alleged damages for forcible entry, unlawful detainer, breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with Anderson's contractual relations. Anderson's requested damages included lost profits under the sublease with Houldson.

¶ On July 8, 1994, the District Court granted Anderson's motion for partial summary judgment and determined that the options found in the Grenfell-Anderson lease could be automatically exercised and were therefore enforceable in this case.

¶ A bench trial was conducted on May 7 and 8, 1998. The District Court issued its findings of fact, conclusions of law, and order on June 17, 1998, in favor of Grenfell. From that decision, Anderson now appeals.

## Standard of Review

¶ This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Whalen v. Taylor* (1996), 278 Mont. 293, 299, 925 P.2d 462, 465. Additionally, in determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party. *Roberts v. Mission Valley Concrete Indus., Inc.* (1986), 222 Mont. 268, 271, 721 P.2d 355, 357.

¶ We review a district court's conclusions of law to determine whether those conclusions are correct. *Hollister v. Forsythe* (1995), 270 Mont. 91, 93, 889 P.2d 1205, 1206.

¶ In this instance, Anderson has appealed both findings of fact and conclusions of law reached by the District Court in favor of Grenfell. Accordingly, we will review each issue applying both standards in determining whether the findings of fact can be supported, and in turn whether the conclusions of law based on the findings are correct.

## Issue 1.

Did the District Court err in concluding that in the absence of controlling provisions in the lease mailing a certified letter provided Anderson with actual notice?

¶ The District Court concluded that Anderson had actual notice that he was in default under the terms of the lease once the notice of default had been mailed to him. The findings of fact supporting this conclusion indicate that:

> On October 17, pursuant to the terms of the lease, Lessor sent Lessee a certified letter outlining such defaults and stating that if the balances (including late charges) were not brought current by October 28, 1991, Lessor would take possession of the building. Lessee did not claim the certified letter.

¶ The findings further indicate that "common law notice requirements are controlling," due to the lack of guiding statutes or an express provision in the lease. Consequently, the District Court followed the rule that "written notices should be sent in a manner that is reasonably calculated to place a party on notice." This rule, however, does not address *when* such a notice can be deemed effective as a matter of law; rather, it addresses *how* such notices should be sent. Thus, the District Court's finding that the "certified letter sent by Lessor to Lessee was reasonably calculated to notify Lessee of the alleged default and was in substantial compliance with the terms of the lease," fails to properly address the issue of whether written notice under the lease requires actual receipt by Anderson.

¶ In order to shed some clarity on the issue of notice, we must first distinguish between "knowledge of default" and "notice of default," which seems to have influenced the District Court in its findings. Obviously, Anderson *knew* that he was late in paying October rent. Under the terms of the lease, he would likewise *know* that Grenfell could exercise his right under the terms of the lease to lawfully "enter upon the leased premises," and repossess the premises "as if this lease had not been made." But Anderson would have no knowledge of whether Grenfell had so elected unless he received written notice, and thereby was afforded a 10-day grace period to cure the alleged default. Although the record indicates that from time to time Anderson was late in paying rent--particularly the utilities portion--the 10-day cure provision had been exercised by Grenfell only once prior to October of 1991--in December of 1989. Therefore, Anderson's knowledge that he was late in paying rent is irrelevant to the discussion of whether he received a default notice. With this said, we now address what constitutes effective notice under the lease in question.

¶ Anderson suggests that the common law "notice to quit" rule should apply. This rule states that "notice is generally held to be sufficient if it is served in such a way as will cause it to come into the hands of the party served . . ." 49 Am.Jur.2d *Landlord and Tenant* § 274 (1995). Anderson then directs our attention to *Hotel Hay Corp. v. Milner Hotels, Inc.* (Wisc. 1949), 39 N. W.2d 363, which held that a similar 20-day default cure period did not commence until the lessee was in actual receipt of the notice. Finally, he cites to the Restatement (Second) of Property for the rule that if notice of termination is mailed "the notice is not effective until it is received by the addressee." Restatement (Second) of Property, *Landlord and Tenant* § 1.5 cmt.f (1977). This rule is intended to govern periodic tenancies, which have no fixed ending term.

¶ Grenfell, in his brief to this Court, likewise argues that the common law rule for sufficient default notice is controlling in this case. Grenfell's authority in support of this contention, however, pertains to other states' statutes that abridge the common law by specifically authorizing that notice is effective upon mailing. Grenfell distinguishes the authority presented by Anderson by stating the rule that "where the notice has been properly mailed, its receipt will be presumed, *in the absence of evidence to the contrary*." *In re Leterman, Becher & Co., Inc.* (2d Cir. 1919), 260 F. 543, 548 (cited in *Hotel Hay Corporation*, 39 N.W.2d at 366) (emphasis added). In turn, Grenfell provides the *evidence to the contrary* by stating that "Anderson did not receive

the October 17, 1991 certified letter," and that the letter was returned to Grenfell on November 4, 1991 "unopened," thus nullifying the presumption that Anderson was in receipt of a properly mailed notice.

¶ While we often look to other jurisdictions and learned treatises for guidance where Montana case law is insufficient--as the briefs by both parties suggest we should--in this instance we in fact find compelling authority in our own state reporter not cited by either party. In a similar case involving sufficient notice, we affirmed a district court's finding that a 10-day right of first refusal found in a lease, premised on the giving of written notice "by registered mail, addressed to Lessees at the said premises" was still insufficient where the tenants did not actually receive the notice. *Hill v. Zuckerman* (1960), 138 Mont. 230, 236, 355 P.2d 521, 525.

¶ *Hill* involved a commercial lease for a bar in Great Falls between Zuckerman, the lessor, and Hill, the lessee. The conflicting facts indicated that Zuckerman mailed notice to William Earl (a predecessor in interest to Hill), and alleged that Earl "wouldn't accept it." *Hill*, 138 Mont. at 235, 355 P.2d at 524. Earl testified, however, that he "never refused to claim the letter because he was not at the given address when it was supposed to have been delivered." *Hill*, 138 Mont. at 236, 355 P.2d at 524. Similar to the case here, the facts showed that the registered mail was returned "unclaimed," and that Zuckerman sent the letter to the home address of Earl rather than the bar as contemplated by the terms of the lease. *Hill*, 138 Mont. at 234, 355 P.2d at 523.

¶ The foregoing accords with what this Court views as the "common law rule" that controls this issue in Montana, which we find most clearly and succinctly stated by the following:

> Where a statute or rule merely states that written notice must be given, without stating how it is to be given, it is not enough that the notice is mailed. It must also be received. In other words, the effective date of the notice is the day it is received, rather than the day it is mailed. The same rule applies in the case of a contract, in the absence of express provisions to the contrary.

58 Am.Jur.2d *Notice* § 35 (1989). *See also* 66 C.J.S. *Notice* § 28 (1998) (stating that "[i]n the absence of a statute providing otherwise, notice . . .is not given until it is received by the person to be notified . . .").

¶ We therefore conclude that absent a statutory mandate or a controlling provision in the lease, Grenfell's decision to enforce the 10-day default cure period was effective only upon actual receipt of a written notice by Anderson--whether hand delivered, mailed, or otherwise. The record clearly indicates that Anderson never actually received the October 17, 1991 notice prior to the October 28, 1991 lockout. Grenfell in fact testified that the certified letter was returned to him unclaimed and unopened. We therefore must hold that the District Court's conclusion that Anderson had actual notice, effective by Grenfell's certified mailing alone, was incorrect. This conclusion is reversed.

**Issue 2.**

Did the District Court err in concluding that Anderson had constructive notice of the contents of

the October 17, 1991 certified letter?

¶ The District Court concluded that Anderson had constructive notice that he was in default. This conclusion renders the actual notice finding irrelevant. Constructive receipt of the notice would impute to Anderson knowledge of the contents of Grenfell's certified letter, whether or not it was actually received, and thereby commence the 10-day default cure period.

¶ In its findings of fact, the District Court stated that "Lessee's *refusal* to claim the certified default letter that was sent by Lessor, at a time when the parties were aware that lease payments were owed, is an unreasonable act by the Lessee which deprives the Lessor of the benefits of the notice provision of the lease" (emphasis added). The District Court also stated that "Lessee did not *claim* the certified default letter."

¶ We agree with the District Court that under such circumstances, a party may not "escape the effect of the giving of a written notice by refusing to receive it when it is presented in person as a notice." 58 Am.Jur.2d *Notice* § 33 (1989). Accordingly, the District Court was correct in finding that "a person may not profit from his own wrongful act." We further conclude, however, that in the context of giving notice by certified mail, this rule requires an *actual refusal to accept*. On this point, we must turn to other jurisdictions for guidance. *See Long v. Crum* (Iowa 1978), 267 N.W.2d 407, 411; *Helland v. Larson* (Ill. App. 1985), 485 N.E.2d 457, 459-60 (applying the rule that refusal to accept certified letter constituted constructive receipt of notice); *Hignell v. Gebala* (Cal. App. 1949), 202 P.2d 378, 382 (concluding that defendant was bound by notice although she refused to accept it).

¶ In *Long*, the Supreme Court of Iowa determined that where a statute required a landlord to send notice of termination of tenancy by restricted certified mail, and there was proof of the tenant's refusal to accept the notice, "that statute is satisfied and the notice becomes effective." *Long*, 267 N.W.2d at 411. The court in *Long* noted, however, in the context of certified mail, letters that are returned "unclaimed" are not evidence of a refusal to accept delivery; rather, "unclaimed" typically means that the postal service left notice at the address that it had attempted to deliver the certified mail, and that the mail subsequently could be retrieved at a designated post office. Therefore, the party's receipt of the notice is one step removed and constructive knowledge cannot be imputed. *Long*, 267 N.W.2d at 411.

¶ The foregoing returns us to our discussion in *Hill*. As previously noted, a party in *Hill* testified that he "never refused to claim the letter because he was not at the given address when it was supposed to have been delivered." *Hill*, 138 Mont. at 236, 355 P.2d at 524. Similar to the facts here, the registered mail in *Hill* was returned "unclaimed," namely because Zuckerman, the lessor, sent the letter to a home address rather than the address contemplated by the terms of the lease. *Hill*, 138 Mont. at 234, 355 P.2d at 523. Applied to the facts here, there is no indication that the Ernest Avenue address was ever contemplated as a proper place of serving notice.

¶ Due to the patent uncertainty regarding written notice in the lease between Grenfell and Anderson--an uncertainty acknowledged by both parties as well as the District Court--we are inclined to look to the "interpretation that the parties, in performance of the lease, have placed on such provisions." 49 Am.Jur.2d *Landlord and Tenant* § 59 (1995). *See also Billings Clinic v. Peat Marwick Main & Co.* (1990), 244 Mont. 324, 336, 797 P.2d 899, 907 (stating the general rule that where contractual duties are ambiguous, the intent of the parties may be derived by examining their conduct); *Johansen v. State*, 1999 MT 187, ¶¶ 14-17, ___ Mont. ___, ¶¶ 14-17, 983 P.2d 962, ¶¶ 14-17 (affirming District Court's finding that course of dealing between parties established that lease payment was effective the day it was placed in the mail).

¶ Anderson asserts that he "was available at all times for service of Grenfell's notice of default at his places of business," and his "employees had accepted all of Grenfell's prior business matters concerning this lease which included bills, invoices, and statements." Grenfell for the most part admits the same: that during the course of the lease, he had hand-delivered or mailed all bills and invoices to one of Anderson's places of business. Ultimately, this course of performance between the parties was demonstrated by the fact that while the certified mailing to the Ernest Avenue address was ineffective, personal service of the October 30, 1991 notice at one of Anderson's places of business was accomplished by one of Grenfell's employees.

¶ Grenfell claims that "Anderson has a history of not claiming certified letters, which is his choice." Likewise, in light of the parties' prior course of performance under the lease, it was Grenfell's choice to inexplicably serve the default letter on Anderson in a manner that Grenfell acknowledged would not be effective--having failed on the one occasion prior to 1991 to serve notice in the same manner. Grenfell further suggests that Anderson was avoiding contact with Grenfell during the month of October, 1991, leaving him no choice but to send the notice by certified mail. Even so, the governing practice by the parties would have permitted personal service of the default notice on one of Anderson's employees, at one of Anderson's well-known places of business.

¶ On this issue, we conclude that the District Court's determination that Anderson refused Grenfell's notice of default is not supported by substantial evidence in the record. The underlying facts related to this issue do not demonstrate that Anderson actually *refused* receipt of the certified mail, contrary to the District Court's finding. In other words, if Grenfell had provided the court with evidence that a postal worker had handed Anderson the certified letter from Grenfell at the Ernest Avenue address, and Anderson had refused to accept it, then the District Court's finding that he "*refused* to claim the certified default letter" would stand, as would its conclusion that Anderson was in constructive receipt of the default notice. Likewise, any evidence that Anderson avoided or refused service of notice pursuant to the well-established course of performance between the parties would also support a conclusion that he could be charged with constructive receipt of the default notice. Indeed, Anderson would not be permitted to profit from such wrongs.

¶ We do agree with the District Court that the evidence shows that Anderson "did not claim the certified default letter." But pursuant to the Iowa court's reasoning in *Long*, which we find persuasive on this issue, this act alone is insufficient to impute the notice of default to Anderson, and thereby commence his 10-day cure period.

¶ Consequently, the District Court's conclusion that Anderson had constructive notice was incorrect, and is therefore reversed.

Issue 3.

Did the District Court err in calculating damages resulting from Anderson's failure to cure his defaults?

¶ The District Court concluded that Anderson did not cure his defaults. The court does not, however, reference to which 10-day period this conclusion applies, the one following the October 17, 1991 notice--which the District Court concluded was sufficient--or the October 30, 1991 notice, which the parties discuss at length in their briefs on appeal. Regardless, the District Court concluded that Grenfell was entitled to damages for unpaid rent and

utilities for the full term of the lease, and for rents received by Anderson from his subtenant. We agree with Anderson that this assessment, totaling $4,148.78, was incorrectly calculated.

¶ As a preliminary matter to this issue, several key points of law need to be addressed.

¶ First, and foremost, the October 30, 1991 default notice to Anderson, and all those subsequent, are irrelevant as a matter of law, because by that date Grenfell had terminated the lease and Anderson was no longer in possession of the premises. Likewise, this conclusion nullifies Anderson's argument that Grenfell's October 30, 1991 notice waived or revoked the October 17, 1991 notice.

¶ Grenfell's changing the locks on the premises on October 28, 1991, pursuant to the express terms of the lease, effectively terminated the lease between Grenfell and Anderson. In *LIC, Inc. v. Baltrusch* (1985), 215 Mont. 44, 48, 692 P.2d 1264, 1266, we concluded that by changing the locks a party had as a matter of law repossessed the premises. *See also Deeb v. Canniff* (Colo. App. 1971), 488 P.2d 93, 95 (holding that changing the locks by sublessor terminated sublease agreement, and trial court properly withdrew sublessor's counterclaim for rent from the jury); *Towers Co. v. Trinidad and Tobago* (S.D.N.Y. 1995), 903 F.Supp. 515, 527 (*stating that changing the locks to rented premises constitutes an eviction so long as evidence sufficiently demonstrates intent of* the landlord to keep the tenant out by reason of this action). That this act conclusively terminated the lease is enhanced by the fact that on October 29, 1991, Grenfell sent a letter to Bice, Anderson's sublessee, instructing him to remit rent and utility payments directly to Grenfell, under the theory that his repossession entitled him to take over Anderson's subleases. In all respects, the evidence demonstrates that the these acts were intended by Grenfell to terminate the lease in accordance with the lease's terms.

¶ Second, once Grenfell changed the locks, took possession, and thereby terminated the lease, Anderson's obligations, including payment of rent, ended as a matter of law. In determining damages in *LIC*, the lease, unlike the one in question here, provided that the landlord could retake possession "without terminating the lease." *LIC*, 215 Mont. at 47, 692 P.2d at 1266. Therefore, the tenant could still be held accountable for rent under the remaining lease term. *See also Gallatin Valley Medical Dental Center, Inc. v. Lemley* (1983), 206 Mont. 241, 245-46, 670 P.2d 83, 85 (holding that the lessee was liable for future rent following termination where the lease provided for this right).

¶ We thoroughly addressed the consequences of a lease that does not expressly provide for the continuing right to receive rent following termination in *Knight v. OMI Corp.* (1977), 174 Mont. 72, 568 P.2d 552. In *Knight*, OMI, the lessee, was delinquent in its rent payments under a commercial lease. The Knights, following their termination of the lease, reentry, and repossession, sought damages for being deprived of future rent throughout the entire term of the lease, less any sums recoverable in mitigation. In affirming summary judgment for OMI, we stated the rule that "[i]n the absence of clear language expressly preserving such right, courts generally will not construe a lease as providing that, upon reentry or forfeiture, the tenant shall remain liable for unaccrued rent." *Knight*, 174 Mont. at 75, 568 P.2d at 554. We held that "a lease must contain clear language to the effect that a tenant is to remain liable for rent accruing *subsequent* to the landlord's cancellation, if such liability is to be imposed." *Knight*, 174 Mont. at

**77, 568 P.2d at 555.**

¶ Here, the lease expressly provides that upon taking repossession, the landlord was entitled to "enjoy" the premises "as if the lease had not been made," reserving the right to "recover from Lessee all rent due *up to the time of such entry*" (emphasis added). Consequently, we conclude that the award for unpaid rent and utilities to Grenfell cannot be sustained beyond the date he took repossession. Likewise, we conclude that Grenfell's claim for unlawful detainer is void as well, under the logical conclusion that once locked out, Anderson could in no sense unlawfully detain the premises absent a showing of his reentry. What remains to be determined, therefore, is what damages Grenfell may still be entitled to.

¶ The District Court stated in its findings of fact that as of November 9, 1991, within the 10-day period afforded by the effective notice given to Anderson on October 30, 1991, Anderson owed $256.91 for July and September utilities. Grenfell agrees that this is the amount Anderson owed at the time. Anderson, upon tendering payment for the past-due sums, asserted that he was never billed for July, and that pursuant to the ordinary billing cycle, he could not have been in default as of October 17th or 30th, for September utilities.

¶ We conclude that the District Court was correct in assessing that the amount Anderson owed to Grenfell as of November 9, 1991, was $256.91. Whether Anderson was in default as to those amounts is irrelevant. Grenfell had a right, following the October 28, 1991 reentry--whether or not his default notice to Anderson was sufficient--to recover all rent due, including the utility payments. We are left, however, with a definite and firm conviction that a mistake has been committed as to the District Court's determination that Anderson owed Grenfell future rent, including utilities, interest and penalties--for November, December and January. Based on the foregoing, this conclusion was incorrect and, consequently, any additional amount of damages based in these findings was incorrect.

¶ We therefore affirm the portion of the District Court's findings that the sum, $256.91, represents the amount recoverable in damages by Grenfell resulting from the October 28, 1991 termination of the lease agreement.

Issue 4.

Did the District Court err in concluding that Anderson did not present credible evidence to support his claim for damages?

¶ The District Court concluded that Anderson did not present credible evidence to support his claim for damages against Grenfell. In its findings of fact, the District Court stated that "a false and misleading description of the use of the property cannot provide a credible basis for damage calculation." This finding resulted from evidence at trial that the sublease agreement between Anderson and Houldson, which is the basis for Anderson's claim of lost profits, stated that the "premises are in fit condition for use by Lessee as a print shop." Evidence showed that Houldson, to the contrary, intended to use the premises as a computer equipment repair shop. The District Court further relied on an earlier order, which granted a preliminary injunction in favor of Grenfell, that found that "there is no evidence before this Court that . . . Anderson will be damaged in any way by the issuance of this temporary injunction." The injunction prevented Anderson from terminating his sublease with Bice, and thereby prevented him from subletting to Houldson.

¶ Anderson, in his counterclaim, alleged that Grenfell was liable for forcible entry, unlawful detainer, breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with his contractual relations. We hold that Anderson has presented sufficient credible evidence to support his claims for damages, which must be weighed against the foregoing conclusions of law addressed thus far.

¶ First, in light of our holding that Grenfell's October 17, 1991 notice was insufficient, his subsequent lockout of Anderson, on October 28, 1991, lends merit to Anderson's forcible entry and unlawful detainer claims. The same holds true for Anderson's claims that the lockout was a breach of the lease agreement and the covenant of good faith and fair dealing. Accordingly, on remand, these claims should be addressed in this new light.

¶ As for Anderson's claim for lost profits, resulting from Grenfell's alleged interference with Anderson's sublease with Houldson, the District Court's findings suggest that the sublease between Anderson and Houldson was defective, in that it contained "a false and misleading description of the use of the property." This finding correlates with the "change of use" covenant in the lease, which required Grenfell's "prior approval" of any "subsequent change of use" of the premises.

¶ In order to recover for lost profits, this Court requires that a party establish them with some certainty as well as prove the source of the lost profits. *See Sage v. Rogers* (1993), 257 Mont. 229, 241, 848 P.2d 1034, 1041. In the past, we have upheld an award of lost profits to a lessee, once liability for a breach of the lease agreement by the lessor was established. *See generally Lee v. Kane* (1995), 270 Mont. 505, 893 P.2d 854. Further, the rule as stated in the Restatement is that, when the leased property is used for business purposes, damages include "loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be caused by the default." Restatement (Second) of Property, *Landlord and Tenant* § 10.2(5) (1977). Here, the District Court concluded that with or without Grenfell's approval, a sublease with a "false and misleading description" fails to provide credible evidence for the purposes of damage calculation.

¶ The language found in the Anderson-Houldson sublease, however, is irrelevant in determining whether Grenfell is liable to Anderson for lost profits. Grenfell was not a party to the sublease. At no time did Anderson present the sublease agreement to Grenfell for his approval, and thereby mislead Grenfell as to the nature of the sublease. Furthermore, no specific provision in the Grenfell-Anderson lease required that Anderson seek approval--and by inference seek review--of any subleases he may have entertained. Rather, the lease only permitted Grenfell to approve or disapprove the lessee's "use" or change in the "use" of the premises. Even so, it is unclear from the lease, as well as the course of performance between the parties, under what circumstances a "change of use" would occur requiring Grenfell's approval--let alone a review and approval of a sublease agreement between Anderson and a third party.

¶ The record indicates that in October of 1991, Anderson used the same sublease agreement that had been rejected by Bice (who owned the print shop), and merely struck out certain provisions in negotiating the sublease with Houldson. Although the District Court is correct that the Anderson-Houldson sublease provided that "the premises are in fit condition for use by Lessee as a print shop," and that Houldson's intended use was for a computer equipment repair shop, the sublease also provided that "Lessee may use the premises for any lawful purpose," which would include a computer equipment repair business. The only party who could rightfully claim that he was misled by a false description, therefore, would be Houldson, not Grenfell.

¶ The clear facts remain that Anderson entered into a valid sublease agreement with Houldson on October 20, 1991, that Grenfell was made aware of this sublease by Bice shortly after October 24, 1991, and by Anderson in early-to-mid November prior to Houldson taking possession on December 1, 1991, and that due to Grenfell's lockout and attempts to take over Anderson's sublease with Bice, Anderson was prevented from subleasing the premises to Houldson. Accordingly, we again conclude that the District Court erred in its determinations. We conclude that Anderson, contrary to the District Court's conclusion, has presented credible evidence to support his claim for lost profits. Whether Grenfell is in fact liable for damages under any of Anderson's claims, as well as whether he could have foreseen Anderson's lost profits at the time their lease was made, are matters that should be addressed upon remand.

¶ The District Court also relied on an order granting Grenfell a preliminary injunction in reaching its conclusion that Anderson had not presented credible evidence to support his claim for damages. That order, however, contains several key errors in light of the conclusions reached here. The order stated that Anderson gave notice to Bice to vacate the premises even though he was not in default under the terms of his lease with Anderson. This is incorrect as a matter of law because the tenancy was month-to-month and could be terminated upon 30-days notice. The order found that Grenfell did not receive notice of the termination of Bice's subtenancy in accordance with the lease. Whether such notice was necessary under the terms of the lease remains unclear and, regardless, the record shows that both Bice and Anderson informed Grenfell of the termination of the subtenancy prior to any attempt by Houldson to take possession. The order further states that there was "no evidence" that Anderson had a "legally bound alternative subtenant to lease the said premises." The record shows that Anderson in fact had executed a lease with Houldson, and had received an advance rent payment. Thus, the order does not provide current credible evidence that Anderson was not damaged as a result of being prevented from entering the sublease with Houldson. Accordingly, the District Court was mistaken in its reliance on this order in concluding that Anderson did not present credible evidence to support his claim for damages.

¶ Finally, in addressing the issue of Anderson's alleged damages, we affirm certain legal consequences found by the District Court concerning the sublease agreement between Anderson and Houldson. The sublease was signed by both Anderson and Houldson on October 20, 1991. The term of the lease was from December 1, 1991, to January 31, 1996, or for four years and two months. Anderson alleges that due to Grenfell's various means of interference, his damages should include the lost profits from this lease, as well as the five-year option that would have commenced January 31, 1996. We affirm the District Court's finding that this option, which was never signed by Houldson, is too speculative to support a damage calculation.

¶ We reverse and remand for further proceedings in accordance with the provisions of this opinion.

**/S/ JAMES C. NELSON**

No

**We Concur:**

**/S/ J. A. TURNAGE**

**/S/ KARLA M. GRAY**

**/S/ WILLIAM E. HUNT, SR.**

**/S/ W. WILLIAM LEAPHART**

**/S/ JIM REGNIER**

**/S/ TERRY N. TRIEWEILER**