No. 02-724

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 148

GLEN GROVER,

        Petitioner and Appellant,

   v.

CORNERSTONE CONSTRUCTION N.W., INC.,
a corporation registered to do business in the state
of Montana,

        Respondent and Respondent.


APPEAL FROM:    District Court of the Twentieth Judicial District,
                        In and for the County of Lake, Cause No. DV 98-93
                        The Honorable Ted O. Lympus, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Kenneth S. Thomas, Bothe & Lauridsen, P.C., Columbia Falls, Montana

        For Respondent:

                Erika L. Johnson, Stephen G. Berg, Johnson, Berg, McEvoy & Bostock, PLLP, Missoula, Montana


                                Submitted on Briefs:  April 24, 2003

                                     Decided:  June 8, 2004

Filed:

_____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Glen Grover (Grover), a carpenter, sustained injuries when he fell from the roof of a house on which he was working. The house under construction was owned by Michael and Ruth Crenshaw (the Crenshaws). In addition to filing a workers' compensation claim, Grover sued the Crenshaws and Cornerstone Construction for negligently failing to provide a safe workplace. Section 50-71-201, MCA. The Crenshaws and Cornerstone each filed a Motion *in Limine* requesting that Grover be prohibited from introducing safety standards established under the Occupational Safety and Health Act (OSHA or the Act). The Motions were granted. Grover and the Crenshaws subsequently settled. Following a jury trial and defense verdict for Cornerstone, Grover appeals, challenging the entry of the Order *in Limine*. We affirm.

## ISSUE

¶2 The only issue before this Court is whether the District Court abused its discretion in granting Cornerstone's Motion *in Limine* prohibiting Grover from introducing at trial OSHA safety standards as evidence of Cornerstone's alleged negligence.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In the spring of 1996, the Crenshaws began planning their new home along Flathead Lake. After having plans drawn and obtaining the necessary building permits, they asked their brother-in-law, Stephen Tartaglino, who was married to Ruth Crenshaw's sister, to act as "general contractor" over the project. The three of them entered into a written contract on May 29, 1996.

2

¶4     Tartaglino had worked in the construction industry for much of his adult life, but for a few years prior to this time, in addition to construction work, he also had worked as a licensed paramedic and emergency medical technician (EMT) in New England.  Upon returning to Montana in August 1995, he was unable to secure an EMT/paramedic position in Kalispell, so he began working as a building contractor again.  He was working for a contractor in Kalispell when the Crenshaws approached him about helping in the construction of their house.

¶5     Prior to beginning work on the Crenshaw home, Tartaglino established a sole proprietorship, Cornerstone Construction, N.W., and obtained the necessary licenses, insurance and bonding.  In January 1997, a few months after the accident giving rise to this case, Tartaglino incorporated Cornerstone.  Because Cornerstone was owned exclusively by Tartaglino at the time of Grover's injury, we will use "Tartaglino" and "Cornerstone" interchangeably in this Opinion.

¶6     Tartaglino had only a few small tools when he began assisting the Crenshaws in July 1996, having left his large construction tools in New England.  The Crenshaws provided various tools for use on the construction site and over the course of their home-building project, they purchased other needed tools and equipment which Tartaglino agreed to purchase from them.

¶7     Because Cornerstone had no employees, the Crenshaws contracted with Labor Contractors of Kalispell (Labor Contractors) to provide laborers for the building project. The Crenshaws prepaid Labor Contractors a substantial sum from which Labor Contractors

3

would in turn pay the wages, taxes, and workers' compensation premiums for the laborers it "loaned" to Crenshaws. Grover was employed as a carpenter by Labor Contractors and was one of the workers "loaned" to the Crenshaws. On September 3, 1996, Grover fell from the roof of the Crenshaw home and sustained injury.

¶8 In addition to filing a workers' compensation claim, Grover filed suit against the Crenshaws and Cornerstone in July 1998, alleging that they negligently failed to provide a reasonably safe place to work. Section 50-71-201, MCA. Prior to the jury trial, the Crenshaws and Cornerstone filed Motions *in Limine* seeking to prohibit Grover from presenting the OSHA safety standards to the jury as evidence of the Crenshaws' and Cornerstone's negligence. The District Court granted the motions. Shortly thereafter, Grover and the Crenshaws settled their claims. At the conclusion of the trial, the jury returned a verdict in favor of Cornerstone.

¶9 Grover filed a timely notice of appeal. He asserts that the District Court erred in granting Cornerstone's Motion *in Limine*. He asks that we set aside the jury verdict and order a new trial in which he would be allowed to introduce the OSHA safety standards.

## STANDARD OF REVIEW

¶10   We review a district court's grant or denial of a motion *in limine* for an abuse of discretion. *State v. Brasda*, 2003 MT 374, ¶ 14, 319 Mont. 146, ¶ 14, 82 P.3d 922, ¶ 14 (citation omitted). A district court abuses its discretion if the district court "acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." *Brasda*, ¶ 14 (citation omitted). Furthermore, "[t]his Court will uphold the decision of a district court, if correct, regardless of the lower court's reasoning in reaching its decision." *Hulse v. State, Dept. of Justice,* 1998 MT 108, ¶ 15, 289 Mont. 1, ¶ 15, 961 P.2d 75, ¶ 15.

## DISCUSSION

¶11   Grover maintains that, under OSHA, certain safety procedures and equipment were required in the construction of the Crenshaw home. He asserts that Cornerstone failed to provide the required safety equipment and that, as a result, he fell from the Crenshaw's roof. He further maintains that he should have been able to present the OSHA safety guidelines to the jury in his effort to prove that Cornerstone was negligent in failing to provide an adequately safe work environment. Grover submits that while violations of the OSHA rules in the construction industry are not considered negligence *per se*, they are evidence of common law, or ordinary, negligence. He argues that because the jury was not allowed to consider the OSHA guidelines, a disproportionate amount of negligence was attributed to him, thus precluding his recovery at trial.

¶12 To support his position that the OSHA regulations applied to this construction project, Grover contends that Tartaglino was an experienced and knowledgeable commercial builder who was aware of the industry accepted safety standards. Grover maintains that Tartaglino undertook the construction of a residential home that was not his own, and thus was participating in a construction endeavor that was part of the construction industry as a whole.

¶13 In reaching its decision, the District Court applied the following two-part rule announced in *Lynch v. Reed* (1997), 284 Mont. 321, 944 P.2d 218:

> 1) A code or standard sought to be admitted for the purpose of "conclusively determining the standard of care imposed upon the defendant" must have been adopted by a governmental agency so as to have the force of law; and
>
> 2) Where a code or standard does not have the force of law, it may nevertheless be admitted as substantive evidence of negligence if it is coupled with a showing of general acceptance in the industry concerned.

*Lynch*, 284 Mont. at 328, 944 P.2d at 223. Applying this rule, the District Court pointed to the fact that Grover was employed by Labor Contractors, not Cornerstone. It therefore concluded that Tartaglino was not Grover's "employer." The court stated that OSHA does not impose obligations upon an owner where the worker in question is an independent contractor and not an employee of the owner. The court further concluded, under the second part of the *Lynch* test, that the Crenshaw construction project--a private residence construction project--was not the type of project that "fits within the scheme of the construction industry in general."

6

¶14　We disagree with the District Court's reasoning, but for the reasons set forth below, nonetheless affirm the District Court's decision. *Hulse,* 1998 MT 108, ¶ 15, 289 Mont. 1, ¶ 15, 961 P.2d 75, ¶ 15.  We conclude that, in order to determine whether the District Court abused its discretion in granting the Motion *in Limine*, we must analyze not who was the employer, but rather, who had control over the safety of the operations of the workplace.

¶15　In *Shannon v. Howard S. Wright Const. Co.* (1979), 181 Mont. 269, 593 P.2d 438, we affirmed the jury's verdict finding that both the owner Big Sky and the general contractor Wright were liable under § 41-1710, RCM (1947)[1] of the Montana Safety Act for the injuries sustained by the employee of a subcontractor, because Big Sky and Wright "took an active part in the decision-making which affected the [subcontractor's] working conditions" and exercised "control over the means by which the subcontractor's employees could reach their places of work on the upper levels of the condominiums."  *Shannon*, 189 Mont. at 277 and 79, 593 P.2d at 442 and 443.  We concluded that "Big Sky not only retained the supervisory capacity . . . but exercised that authority in a manner that directly affected the access of the subcontractor's employees to the condominiums, thereby forcing them to climb ladders and crawl through a window casing.  In Wright's case, as general contractor, it had the authority to order temporary stairs and handrails built, but its project superintendent . . ., decided not to . . . .  Thus the authority to create safe working conditions rested entirely with Big Sky and Wright."  *Shannon*, 181 Mont. at 281, 593 P.2d at 444-45.

---

[1]　Subsequently re-numbered § 50-71-201, MCA (1978).

7

¶16 Subsequently in *Gibby v. Noranda Minerals Corp.* (1995), 273 Mont. 420, 905 P.2d 126, we affirmed the jury's verdict in favor of an injured worker and against the majority owner and manager of operations, Noranda, finding that Noranda expressly retained supervisory authority over the subcontractor's employees and methods of operation, including employee safety. *Gibby*, 273 Mont. at 425, 905 P.2d at 129. We also noted that "[i]n addition to this contractual grant of authority," evidence presented at trial showed that Noranda extensively exercised this authority on-site, clearly indicating that it was in "actual control" of the worksite. *Gibby*, 273 Mont. at 426, 905 P.2d at 130.

¶17 We conclude a similar analysis should be applied here. In resolving whether the District Court abused its discretion in precluding the admission of the OSHA regulations against Tartaglino, we will look to the evidence to determine the extent to which he was in actual control over safety and working conditions in the workplace.

¶18 It is apparent from the record that both Michael Crenshaw and Tartaglino exercised varying levels of control over the project. It would appear, however, that Tartaglino's control over the worksite was much narrower than seen in *Shannon* or *Gibby*.

¶19 The substantive terms of Tartaglino's contract with the Crenshaws were:

> Steve Tartaglino will be the General Contractor and be paid an hourly wage of $25 per hour for those duties. He will be bonded insured and licensed in Montana as a General Contractor. Steve is committed to stay on the job at least until the roof is complete.

> Labor will be furnished by Labor Contractors.

> Purchases and billings will be paid through Bachelor Sales Ltd. [the Crenshaws' company].

8

¶20 Unlike the comprehensive contract in *Gibby*, Tartaglino's contract did not address, or even mention, a project safety program, safety devices, safeguards or protective equipment. Therefore, Tartaglino did not expressly and contractually accept responsibility for safety on the site.

¶21 The Crenshaws designed the home and assumed responsibility for obtaining the necessary permits. During construction, Michael Crenshaw visited the site on an average of 2-3 days per week. On some visits he performed light carpentry tasks or cleaned up around the site. He constructed a ladder for the comfort and safety of the crew. He frequently observed crew members performing their jobs. Additionally, he provided some of the tools used by various crew members and purchased others during the course of the project. Both Crenshaw and Tartaglino fired workers during the project. Tartaglino terminated at least two workers based on the need to down-size the work crew. Crenshaw, however, assumed the responsibility for terminating a worker for cause.

¶22 From the record it appears that Tartaglino's primary day-to-day function was to perform construction--just like Grover and the other laborers borrowed from Labor Contractors. Moreover, the record reveals that Tartaglino and Crenshaw selected experienced carpenters from Labor Contractors, all of whom had worked on multiple residential home constructions prior to this project. At the beginning of the project, Crenshaw and Tartaglino instructed the subcontractor's employees to work safely and utilize any safety practices, procedures or equipment necessary to perform their given tasks. While Tartaglino had general oversight responsibilities designed to move the project forward to

9

completion, unlike Big Sky, Wright Construction or Noranda, he did not exercise actual control over the subcontractor's employees, nor did he dictate to them in any specific manner how they were to perform their jobs. Finally, nothing in the record indicates that Tartaglino either assumed or exercised ". . . the authority to create safe working conditions . . ." *Shannon,* 181 Mont. at 281, 593 P.2d at 444.

¶23 In summary, under the specific facts of this case and given the law as set forth above, we cannot conclude that the District Court abused its discretion in precluding the admission of the OSHA safety standards as evidence against Tartaglino. We therefore affirm the District Court's Order granting Cornerstone's Motion *in Limine*.

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

10