FILED

December 16 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 07-0743

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 434

TIN CUP COUNTY WATER AND/OR SEWER DISTRICT,

        Plaintiff and Appellant,

  v.

GARDEN CITY PLUMBING & HEATING, INC., a
Montana corporation and DRUYVESTEIN JOHNSON
& ANDERSON, Inc. a Montana corporation,
DRUYVESTEIN JOHNSON & ANDERSON, PC, a
Montana Professional Corporation and DOE DEFENDANTS,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV 05-453
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Daniel H. Israel, Attorney at Law, Boulder, Colorado
          Ross D. Miller, Attorney at Law, Missoula, Montana

      For Appellee (Garden City):

          Daniel J. Whyte, Keller, Reynolds, Drake, Johnson & Gillespie, Helena,
          Montana

      For Appellee (Druyvestein Johnson & Anderson):

          Neil G. Westesen and Brad Brown, Crowley, Haughey, Hanson, Toole &
          Dietrich, Bozeman, Montana

Submitted on Briefs:  August 19, 2008

Decided:   December 16, 2008

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Tin Cup Water and/or Sewer District (Tin Cup) appeals from an opinion and order of the Twenty-First Judicial District, Ravalli County, that granted summary judgment in favor of Garden City Plumbing and Heating, Inc. (Garden City) and Druyvestein Johnson & Anderson, Inc. (DJA). The opinion and order arose from Tin Cup's dispute with Garden City and DJA regarding repair work on the Tin Cup dam in the Selway-Bitterroot Wilderness in 1997. We affirm.

¶2     We review the following issues on appeal:

¶3     *Did the District Court properly grant DJA's summary judgment motion based upon its determination that the three-year statute of limitations for torts barred Tin Cup's action against DJA?*

¶4     *Did the District Court properly grant Garden City's motion for summary judgment when it determined that Tin Cup had failed to meet its burden of showing that genuine issues of material fact existed as to causation?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     The Tin Cup dam is a rock and earthen dam originally constructed in 1906 to provide irrigation water for farmers in the Bitterroot Valley. The dam is located in the Selway-Bitterroot Wilderness west of Darby, Montana. Tin Cup operates and maintains the dam under the terms of a special use permit issued by the United States Forest Service (Forest Service). Tin Cup supplies water to approximately 100 irrigators.

¶6     Various United States government reports documented deterioration of the dam. The reports began as early as the 1950s and documented leakage, seepage, and internal erosion. Several reports indicated a serious need for repairs to the dam structure. The dam's old

outlet system, a masonry conduit built into the bottom of the dam, had crumbled in places. The deterioration of the outlet system permitted water to flow into the interior of the dam. This water carried dirt and other material through the outlet works. The outflowing water also carried portions of the dam embankment. This deterioration left voids in the dam structure. The Forest Service and the State of Montana (State) classified the dam as a "high hazard."

¶7    Tin Cup hired DJA, an engineering and surveying firm in Missoula, to provide engineering services for replacement of the dam's outlet conduit pipe. DJA executed a letter agreement with Tin Cup for engineering design services for replacement of the outlet conduit pipe on March 25, 1997. DJA outlined a two phase project.

¶8    Phase I of the project called for crews to slip-line the old outlet conduit with a high density polyethylene (HDPE) pipe. The parties planned to grout and seal the annulus, or gap between the HDPE pipe and the existing masonry outlet conduit. The letter agreement anticipated the completion of phase I of the project by September 5, 1997. In phase II, planned for 1998, the parties contemplated further improvements and repairs to the dam.

¶9    The Forest Service issued an Environmental Assessment (EA) of the Tin Cup dam project in May of 1997. The EA confirmed the dam's high hazard classification and confirmed the need for the new pipeline and grouting. The Forest Service issued a Notice of Decision approving the project on July 16, 1997. The Forest Service issued a 90-day special use permit on September 30, 1997, that allowed Tin Cup to access the dam and replace the pipeline. The permit placed sole responsibility for the dam's safety on Tin Cup. The permit

further required that Tin Cup be liable for up to $1 million for any damage to property or life.

¶10    Two factors delayed implementation of the phase I project. First, Tin Cup rejected all of the bids for the work. Tin Cup had to conduct a second bid process. Second, environmental groups filed a lawsuit in federal court on October 2, 1997, to prohibit the use of helicopters and mechanized equipment in the wilderness area. *See Wilderness Watch v. Kelly,* No. CV 97-164-M-DWM (D. Mont. Oct. 2, 1997). The federal district court issued a temporary restraining order, on October 3, 1997, that prohibited the implementation of the Forest Service's Notice of Decision for the construction project. The federal court ruled on October 10, 1997, however, that the repair project could proceed due to the threat of immediate dam failure.

¶11    DJA executed another letter agreement for engineering services during the construction phase of the project on October 16, 1997. Tin Cup separately contracted with Garden City on October 22, 1997, for the construction, installation, and completion of the phase I outlet pipe improvement project. DJA prepared the contract between Tin Cup and Garden City, but DJA was not a party to the agreement. Tin Cup entered into a separate letter contract and fee agreement with DJA on October 23, 1997, for geotechnical investigation and construction administration services.

¶12    The crews began phase I of the project in late October of 1997, several weeks later than anticipated and under difficult weather conditions and higher than expected water levels. Garden City pulled the HDPE pipe through the conduit and grouted the annulus. Garden City encountered unexpectedly large voids within the masonry conduit caused by

5

deterioration of the dam. As a result, Garden City ran out of grout at the site and did not grout the final eight to ten feet of the conduit from the upstream side of the dam. DJA performed a grout inspection and determined that Garden City had accomplished the Phase I objectives. The parties demobilized from the site. DJA reported the successful completion of Phase I to Tin Cup in a December 1, 1997, letter.

¶13    Tin Cup officials visited the dam on May 4, 1998. The officials observed seepage on the downstream side of the dam adjacent to the newly inserted outlet pipe. Tin Cup reported the seep to the Forest Service, the Bureau of Reclamation, and State dam safety officials. Forest Service and Bureau of Reclamation personnel investigated and confirmed the seep on May 14, 1998.

¶14    Two divers retained by the Forest Service and Tin Cup investigated the origins of the seepage on June 6, 1998. The divers released dye at various points below the surface of the water in an attempt to determine the origin of the seep. The divers videotaped the dye test. The divers' investigation revealed that Garden City had not grouted the conduit completely. Thus, Tin Cup learned of the unfinished grouting no later than June 1998.

¶15    The Forest Service and the State declared an emergency at the dam based on the seepage and the documented history of problems with the dam. The Forest Service retained Garden City to perform extensive remedial work. Garden City partially breached the dam, widened the spillway, and replaced and excavated a portion of the outlet system. The partial breach reduced the reservoir's storage capacity.

¶16    The Forest Service paid Garden City $500,000 for the remedial work, and then billed Tin Cup $1,000,000 for the cost of removing the threat of dam failure. The United States

6

sued Tin Cup for reimbursement of the $1,000,000 costs. *See United States v. Abrahamsen, et al.*, Cause No. CV 03-14-M-LBE (D. Mont. Jan. 31, 2003). Tin Cup and the Forest Service eventually reached a settlement.

¶17 Tin Cup sued DJA and Garden City on September 9, 2005. Tin Cup's initial complaint alleged breach of contract, bad faith arising out of a special relationship with DJA, professional negligence, and indemnification. Tin Cup later amended its complaint to add defendants and claims of negligence, negligent misrepresentation, estoppel/equitable partnership, and alter ego/pierce corporate veil/successor liability and to delete its claims of professional negligence. DJA denied all claims and asserted several affirmative defenses. Garden City denied all claims, asserted several affirmative defenses, and cross-claimed against DJA on the basis that it followed the directions, conclusions, and opinions of DJA and Tin Cup.

¶18 The parties engaged in extensive discovery and filed numerous pre-trial motions. Both Garden City and DJA filed motions for summary judgment based on statute of limitations. Garden City and DJA contended that the complaint alleged various negligence actions grounded in tort, rather than breach of contract actions. DJA further argued for dismissal based on lack of causation and lack of expert testimony. Garden City separately argued for dismissal based on lack of causation. DJA and Garden City additionally filed motions in limine to exclude Tin Cup's proposed expert witnesses.

¶19 Tin Cup submitted two supplemental expert disclosures after oral argument on the pending motions. DJA and Garden City filed motions to strike the supplemental disclosures on the grounds of untimeliness and an improper attempt to create issues of material fact after

7

oral argument. The District Court agreed that Tin Cup's supplemental disclosures should be stricken. The District Court noted the following problems with the supplemental disclosures: 1) the disclosures failed to comply with the Case Scheduling Order and Rules of Civil Procedure; 2) the disclosures prejudiced DJA and Garden City who had no opportunity to examine and rebut; and 3) the disclosures were untimely in that they sought to broaden, supplement, and in the case of purported expert Tex Marsolek, contradict his deposition testimony after full briefing and oral arguments had occurred.

¶20 The District Court granted DJA's motion for summary judgment based on statute of limitations. The District Court denied Garden City's motion for summary judgment based on statute of limitations. The District Court granted Garden City's motion for summary judgment, however, based on Tin Cup's failure to prove causation. The District Court also granted Garden City's motion in limine to exclude or limit expert testimony. Tin Cup appeals.

**STANDARD OF REVIEW**

¶21 We review de novo a district court's decision to grant summary judgment, using the same criteria applied by the district court under M. R. Civ. P. 56. *Prosser v. Kennedy Enterprises*, *Inc.*, 2008 MT 87, ¶ 10, 342 Mont. 209, ¶ 10, 179 P.3d 1178, ¶ 10. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c).

8

¶22    The party moving for summary judgment must establish the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Gliko v. Permann*, 2006 MT 30, ¶ 12, 331 Mont. 112, ¶ 12, 130 P.3d 155, ¶ 12. Once the moving party has met its burden, the party opposing summary judgment must present substantial evidence essential to one or more elements of its case to raise a genuine issue of material fact. *Fielder v. Board of County Com'rs*, 2007 MT 118, ¶ 12, 337 Mont. 256, ¶ 12, 162 P.3d 67, ¶ 12.

## DISCUSSION

¶23    *Did the District Court properly grant DJA's summary judgment motion based upon its determination that the three-year statute of limitations for torts barred Tin Cup's action against DJA?*

¶24    Tin Cup contends that its claims sounded in contract and that the eight-year statute of limitations for contracts set forth in § 27-2-202(1), MCA, should apply rather than the three-year statute of limitations for torts set forth in § 27-2-204(1), MCA. Tin Cup does not dispute the fact that it learned of the alleged grouting failure in June 1998, but it did not file suit until 2005.

¶25    Claims of breach of a professional service contract can sound either in contract or in tort. *Northern Montana Hosp. v. Knight*, 248 Mont. 310, 315, 811 P.2d 1276, 1278-79 (1991). This Court looks to the gravamen of the action rather than relying on the label given to the claim by the plaintiff when determining which statute of limitations applies. *Northern Montana*, 248 Mont. at 314, 811 P.2d at 1278. The injured party may elect the theory that he will pursue if the gravamen of the action rests either in tort or in contract. The statute of

9

limitations governing the elected theory will apply. *Billings Clinic v. Peat Marwick Main*, 244 Mont. 324, 341, 797 P.2d 899, 910 (1990).

¶26 The contract statute of limitations applies only if the alleged breach of a specific provision in a contract provides the basis of the plaintiff's claims. The action sounds in tort, and the tort statute of limitations applies, if the plaintiff claims breach of a legal duty imposed by law that arises during the performance of the contract. *Northern Montana*, 248 Mont. at 315, 811 P.2d at 1278-79. A plaintiff cannot change the gravamen of the action to secure a longer period of limitations simply by virtue of mislabeling a claim for relief. The gravamen of a claim, not the label attached, controls the limitations period applied to that claim. *Guest v. McLaverty*, 2006 MT 150, ¶ 12, 332 Mont. 421, ¶ 12, 138 P.3d 812, ¶ 12.

¶27 The District Court noted that Tin Cup's general claims were that DJA poorly supervised Garden City's construction. Tin Cup based those claims, in part, on provisions of the October 22, 1997, contract between Tin Cup and Garden City. DJA was not a party to the October 22, 1997, contract. The contract provisions refer to DJA's role in supervising and accepting Garden City's work. The District Court concluded that even if DJA had been negligent in supervision and committed malpractice by accepting Garden City's work, the three-year statute of limitations applied because those claims sounded in tort, not contract.

¶28 The District Court also distinguished *Billings Clinic*, 244 Mont. at 324, 797 P.2d at 899. In *Billings Clinic*, an accountant specifically agreed to review a report for accounting and tax considerations and to make recommendations based on possible tax implications. *Billings Clinic*, 244 Mont. at 334, 797 P.2d at 906. The accountant failed to perform, however, and the clinic suffered monetary damages. *Billings Clinic*, 244 Mont. at 329-30,

10

797 P.2d at 903. The District Court observed that Tin Cup had failed to point to any specific provisions in the letter agreements between Tin Cup and DJA that DJA allegedly had breached. The District Court cited the fact that even Tin Cup's own witnesses acknowledged that they could not identify any specific contractual provisions that DJA had breached. The District Court further noted that Tin Cup representative, and proposed expert, Tex Marsolek, asserted that DJA's negligence constituted Tin Cup's basic complaint.

¶29 Tin Cup advances two arguments on appeal. Tin Cup first argues that it may elect to pursue either a contract or tort claim. Tin Cup cites to *Travelers Indem. Co. v. Andersen*, 1999 MT 201, 295 Mont. 438, 983 P.2d 999, for support. Tin Cup points to a statement in *Travelers* that "where an action may be based in either tort or contract, the injured party may elect which theory to pursue." *Travelers*, ¶ 15. Tin Cup provides no additional legal authority or analysis. Tin Cup notes only that its complaint expressly referenced the October 16, 1997, and October 22, 1997, contracts, and that its first claim for relief alleged that the failure of the defendants to comply with the contracts constituted a material breach.

¶30 Tin Cup's incomplete reference to *Travelers* misleads. Immediately before the sentence cited by Tin Cup, the Court explains that only under certain circumstances may potential tort liability coexist with contract liability. *Travelers*, ¶ 15. *Travelers* also states that "the choice of which statute of limitation should apply ultimately rests on a characterization of the essence of the claim." *Travelers* then states that "[c]onsequently, we look to the substance of the complaint to determine the nature of the action and which statute of limitations applies." *Travelers*, ¶ 15. Tin Cup's conclusory citation to *Travelers* notwithstanding, the plaintiff simply may not choose which theory to pursue in any situation.

11

The plaintiff may choose between a tort and contract cause of action only where the substance of the complaint and the nature of the action give them the right to choose. *See Northern Montana*, 248 Mont. at 315, 811 P.2d at 1278-79; *Travelers*, ¶ 15; *Erickson v. Croft*, 233 Mont. 146, 153, 760 P.2d 706, 710 (1988). Tin Cup, therefore, may pursue a contract cause of action only if the gravamen of its complaint sounds in contract. Tin Cup must point to the violation of a specific contractual provision in order for its complaint to sound in contract. *Northern Montana*, 248 Mont. at 315, 811 P.2d at 1278-79.

¶31 The essence of Tin Cup's second argument is that in determining DJA's obligations, this Court should read as one contract the October 16, 1997, letter agreement between Tin Cup and DJA and the October 22, 1997, contract between Tin Cup and Garden City. Tin Cup argues that the two contracts, read together, obligate both Garden City and DJA to perform properly the dam construction project. DJA contends that the contract obligated it only to supervise and inspect Garden City's construction.

¶32 Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, may be taken together for the purpose of interpreting the scope of the contractual relationship between the parties. Section 28-3-203, MCA; *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 22, 294 Mont. 478, ¶ 22, 982 P.2d 1002, ¶ 22. It is also true that in certain limited situations a contract may bind a party that did not sign it. *Union Bank & Trust Co. v. Himmelbauer*, 57 Mont. 438, 442, 188 P. 940, 941 (1920). In other limited situations, several instruments made at the same time in relation to the same subject matter may be read together as one instrument even where the parties are not the same. *Doheny v. United States Fidelity & Guaranty Co.*, 34 F. Supp. 888, 890 (D. Mont. 1940).

¶33　The District Court decided not to read as one contract the October 16, 1997, letter agreement between Tin Cup and DJA and the October 22, 1997, contract between Tin Cup and Garden City. The District Court first determined that the two contracts imposed "distinct and different" duties upon the parties to the contracts. The District Court also determined that the provisions of the October 22, 1997, contract between Tin Cup and Garden City did not bind DJA. The District Court concluded that Tin Cup failed to point to a specific contractual provision in the October 16, 1997, letter agreement allegedly violated by DJA. Tin Cup also admitted in response to a request for admission that "there is no contract for construction" between Tin Cup and DJA.

¶34　We need not determine whether the District Court should have read as one contract the October 16, 1997, letter agreement between Tin Cup and DJA and the October 22, 1997, contract between Tin Cup and Garden City. Likewise, we need not decide whether the District Court correctly determined that the provisions of the October 22, 1997, contract between Tin Cup and Garden City do not bind DJA. As the District Court noted, the three-year statute of limitations for torts still would bar Tin Cup's claims even if Tin Cup's October 22, 1997, contract with Garden City bound DJA.

¶35　Tin Cup argues that the October 16, 1997, letter agreement obligated DJA to coordinate Phase I of the project with the contractor and government entities and to inspect the pipe/grout installation. Tin Cup also cites language in the October 16, 1997, agreement that includes a commitment by DJA to supervise all aspects of the Phase I project. Tin Cup emphasizes language in the October 22, 1997, contract between Tin Cup and Garden City that specifies that DJA shall supervise, verify, and accept Garden City's work on the Phase I

13

project. Tin Cup does not allege, however, that DJA failed to coordinate, supervise, verify, or accept Garden City's work on phase I. Tin Cup asserts that DJA performed these duties poorly.

¶36 The gravamen of Tin Cup's argument is that DJA was professionally negligent in performing its duties to supervise, coordinate, and inspect. Tin Cup does not allege that DJA breached a specific provision of the contract by failing entirely to supervise, coordinate, or inspect. Tin Cup's cause of action with regard to DJA therefore sounds in tort. Tin Cup does not have the option described in *Travelers* of electing tort or contract. *Travelers*, ¶ 15. Tin Cup cannot create a conflict between the two statutes of limitations, or insert doubt as to the gravamen of the action, by mislabeling the cause of action. *Demarest v. Broadhurst*, 2004 MT 147, ¶ 14, 321 Mont. 370, ¶ 14, 92 P.3d 1168, ¶ 14. The District Court correctly determined that the three-year statute of limitations for torts set forth at § 27-2-204(1), MCA, bars Tin Cup's cause of action against DJA.

¶37 *Did the District Court properly grant Garden City's motion for summary judgment when it determined that Tin Cup had failed to meet its burden of showing that genuine issues of material fact existed as to causation?*

¶38 Tin Cup argues that the facts show clearly that the alleged grouting failure in the fall of 1997 directly caused the 1998 dam leak, the emergency declaration, and the damages to Tin Cup. Garden City responds that Tin Cup's causation argument consists of mere assertions not supported by material evidence or any expert opinion showing proximate cause. Garden City contends that Tin Cup has failed to make a prima facie showing of the elements necessary for breach of contract or negligence, and that the District Court correctly

14

granted Garden City's motion for summary judgment.

¶39 A party may not recover damages for breach of contract unless the party proves that the breach of contract proximately caused the damages, or that the damages likely resulted from the breach of contract. *Weyler v. Kaufman*, 196 Mont. 132, 137, 638 P.2d 393, 396 (1981). All damages for breach of contract are subject to limitations of causation, certainty, and foreseeability. The damages clearly must be ascertainable in their nature and origin. *Ehly v. Cady*, 212 Mont. 82, 97, 687 P.2d 687, 695 (1994); § 27-1-311, MCA.

¶40 The District Court determined that Garden City had met its initial burden of showing the absence of any genuine issue of material fact. *Gliko*, ¶ 12. The District Court noted that a number of government witnesses had testified that a combination of factors caused the 1998 leak, including several historical problems with the dam. None of the government witnesses indicated that the 1998 leak would not have occurred, but for the allegedly faulty 1997 grouting operations. The District Court also pointed to the testimony of Garden City's and DJA's expert witnesses. These expert witnesses all testified that the 1997 grouting was not a material cause of 1998 dam leak, the declaration of emergency, or the additional work performed in 1998.

¶41 Garden City offered two experts. Roger Perkins is a civil engineer who had experience with four other grouting operations on dams that had been slip-lined with HDPE pipe. Mr. Perkins testified that the unfinished grouting work undertaken in 1997 did not precipitate the need for the repair work performed in 1998. Bruce Stover is a registered geologist who previously had been involved in six slip-lining dam projects and fifteen

15

annular space grouting projects. Mr. Stover stated that the simple fact that the grouting did not extend to the end of the HDPE pipe was not the root cause of all the ensuing problems.

¶42 DJA expert Douglas M. Yadon likewise testified that the partially grouted annulus did not cause the emergency of 1998. Garden City further notes that all the federal and state government officials who had reported on the dam's condition in 1998 rejected the notion that the 1997 grouting operation had caused them to declare an emergency. We agree with the District Court that Garden City has established the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Gliko*, ¶ 12.

¶43 The burden now shifts to Tin Cup to set forth specific facts showing that a genuine issue of material fact exists as to causation. *Fielder*, ¶ 12. The District Court determined that Tin Cup had not met this burden. The District Court noted that Tin Cup had no expert witnesses to testify that Garden City's alleged breach of contract caused Tin Cup's injury. The District Court further noted that even if it would have allowed Tin Cup's expert witnesses to testify, none of them had opined that the alleged breach more likely than not caused Tin Cup's alleged injury.

¶44 Tin Cup argues that this Court needs no expert testimony to determine causation. Tin Cup suggests that the documentary record confirms that the alleged grouting failure in 1997 caused the 1998 leak and the resulting emergency declaration. We have required expert testimony when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding the evidence. *Dayberry v. City of East Helena*, 2003 MT 321, ¶ 17, 318

16

Mont. 301, ¶ 17, 80 P.3d 1218, ¶ 17.  Tin Cup contends that in this case demonstration of causation is not beyond common experience.  We disagree.

¶45    In *Hinkle v. Shepherd School Dist. # 37*, 2004 MT 175, ¶ 35, 322 Mont. 80, ¶ 35, 93 P.3d 1239, ¶ 35, we deemed the development of ketoacidosis, Type I diabetes, and post-traumatic stress syndrome to fall beyond the common experience and understanding of the trier of fact and required expert testimony.  We also have required expert testimony to assist the trier of fact in determining whether a swimming pool's depth was unreasonably dangerous for the diving board length.  *Dayberry*, ¶ 19.  The District Court correctly noted that the issue of the causation of Tin Cup's alleged damages requires an understanding of the dam's structural history, dam engineering, and hydrology related to a rock and earthen dam, and dam safety.  This knowledge falls beyond the understanding of the trier of fact.  *Hinkle*, ¶ 35; *Dayberry*, ¶ 17.  The District Court properly determined that this case requires expert testimony.

¶46    The District Court granted Garden City's motion in limine to exclude or limit the testimony of Tin Cup's expert witnesses.  We review a district court's grant or denial of a motion in limine for an abuse of discretion.  *Grover v. Cornerstone Const. N.W., Inc.*, 2004 MT 148, ¶ 10, 321 Mont. 477, ¶ 10, 91 P.3d 1278, ¶ 10.  A district court possesses broad discretion in ruling on the admissibility of expert testimony, and without a showing of abuse of discretion, we will not disturb the district court's ruling on appeal.  *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 68, 338 Mont. 259, ¶ 68, 165 P.3d 1079, ¶ 68.  A district court abuses its discretion when it acts arbitrarily without employment of

conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *McCormack v. Andres*, 2008 MT 182, ¶ 22, 343 Mont. 424, ¶ 22, 185 P.3d 973, ¶ 22.

¶47 As previously discussed, ¶¶ 44-45, the issue of the causation of Tin Cup's alleged damages requires expert testimony regarding the dam's structural history, dam engineering, and hydrology related to a rock and earthen dam, and dam safety. Tin Cup argues that if expert opinions are necessary, its experts and lay witnesses established that the grouting failure caused the 1998 emergency declaration. Tin Cup bases this portion of its causation argument on statements from Peter Aberle, James Bush, and Tex Marsolek. Tin Cup engaged James Bush, a civil engineer, to interpret contract documents. Tin Cup portrays Peter Aberle as a grouting expert. Tex Marsolek served as assistant manager for Tin Cup.

¶48 James Bush testified that he was not a hydrologist, agricultural engineer, or geotechnical engineer. Mr. Bush had no specialized experience with dams or wilderness restrictions, and Mr. Bush did not sign or prepare Tin Cup's expert disclosure. The District Court further noted that Tin Cup offered no rebuttal to Garden City's argument that Mr. Bush was not qualified to provide expert opinion other than a conclusory footnote stating in part that "Mr. Bush obviously knows far more about construction and the movement of water through earth than those who questioned him."

¶49 Peter Aberle acknowledged that he had never been to the dam site, that he was not a dam safety engineer or expert, that he was not informed about the history of the dam, and that he could not comment on the sinkholes, piping, or spillway size of the dam. Mr. Aberle stated that he was qualified to testify only to the pulling of the HDPE pipe and the grouting operation. Mr. Aberle also stated that he had an opinion as to whether the grouting operation

18

had been conducted properly under the contract, but not to anything else related to the causes of the dam's failure in 1998. Tin Cup's only response to Garden City's motion to exclude Mr. Aberle's testimony consisted of the conclusory and broad statements that "[e]ach of these experts offer testimony that is not within the range of ordinary training or intelligence," and that each of the experts "has special training or education and adequate knowledge on which to base his opinions."

¶50 Tin Cup offered Mr. Marsolek as an expert on the damages to Tin Cup, and as an expert as to the condition of the dam during the decade leading up to the 1997 repairs. Tin Cup failed entirely before the District Court to address Garden City's argument against allowing Mr. Marsolek's expert testimony regarding the historical condition of the dam.

¶51 The District Court provided a detailed rationale for its decision to exclude Mr. Marsolek and Mr. Bush from any expert testimony and to limit Mr. Aberle's testimony to opinion testimony regarding grouting generally and the grout mixture used at the Tin Cup dam in 1997. Tin Cup offers no persuasive argument why this Court should consider the testimony of Mr. Bush, Mr. Aberle, Mr. Marsolek, or any of the other disqualified witnesses as to causation. The District Court did not abuse its discretion when it excluded and limited Tin Cup's designated witnesses. *Grover*, ¶ 10.

¶52 Moreover, even if the District Court had allowed Tin Cup's designated expert witnesses to testify, their testimony would have been insufficient to defeat Garden City's motion. An expert's opinion is admissible if it is based on an opinion that it is more likely than not that the alleged wrongdoing caused the plaintiff's injury. *Hinkle*, ¶ 36. None of Tin

19

Cup's designated expert witnesses would have testified that it was more likely than not that the 1997 grouting failure caused the 1998 damages.

¶53   Without experts, Tin Cup must resort to conclusory statements and speculative assertions. Tin Cup points to isolated portions of testimony and letters from government witnesses and experts from DJA and Garden City. Tin Cup asserts that these excerpts establish a genuine issue of material fact. Tin Cup does not support these statements and assertions, however, with adequate or persuasive evidence from the record. None of the passages that Tin Cup cites from DJA's witnesses, Garden City's witnesses, and the government witnesses, taken in context, suggest that it was more likely than not that the 1997 grouting failure caused the 1998 damages.

¶54   Tin Cup's conclusory statements and assertions do not constitute facts that are "material and of a substantial nature" that would prevent summary judgment. *Duncan v. Rockwell Mfg. Co.*, 173 Mont. 382, 388, 567 P.2d 936, 939 (1977). Tin Cup must prove by more than mere denial and speculation that a genuine issue of material fact exists. *Valley Bank of Ronan v. Hughes*, 2006 MT 285, ¶ 14, 334 Mont. 335, ¶ 14, 147 P.3d 185, ¶ 14. Tin Cup has not met its affirmative duty to respond by affidavit or other testimony containing material facts that raise genuine issues. *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997).

¶55   The District Court correctly determined that Tin Cup had failed to meet its burden to show any issues of material fact as to causation. The District Court properly granted Garden City's motion for summary judgment on causation. Tin Cup raises the additional issue of DJA's successor entity liability. Tin Cup also argues that the District Court abused its

20

discretion when it ruled on Garden City's motion in limine to strike as an expert Tex Marsolek, Tin Cup's proposed damages witness. Our decision on summary judgment renders moot those issues.

¶56     Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE